**APPEARANCE FORM FOR PRO SE LITIGANTS**
**DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

Information entered on this form is required for any person filing a case in this court as a pro se party (that is, without an attorney).

NAME: _____Robert D. Loventhal_____

(Please print)

STREET ADDRESS: _____15 Hammersmith Road Unit 13_____

CITY/STATE/ZIP: _____Newport, RI 02840_____

PHONE NUMBER: _____617-501-8285_____

CASE NUMBER: _____

_____        _____
            Signature                                                            Date

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## (a) PLAINTIFFS

Robert D. Loventhal

Deborah L. Loventhal

## DEFENDANTS

Select Portfolio Servicing, Inc.
3217 South Decker Lake Drive, Salt Lake City, Utah 84119

U.S Bank, NA: 800 Nicollet Mall, Minneapolis, Minnesota 55402

**(b)** County of Residence of First Listed Plaintiff    Newport County

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Robert D. Loventhal: 5 Hammersmith Road, Unit 13, Newport RI 02840.

Attorneys (If Known)

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ | U.S. Government Plaintiff |
| ☐ 3 | Federal Question (U.S. Government Not a Party) |
| ☐ | U.S. Government Defendant |
| ☐ 4 | Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN    (Place an "X" in One Box Only)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):

Brief description of cause: Breach of contract and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER F.R.C.P. 23

DEMAND $
$500,000.00

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☐ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE                          DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse  (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction**.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.

United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.     Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.**  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**.                    Example:U.S. Civil Statute: 47 USC 553
                    Brief Description: Unauthorized reception of cable service

**VII.     Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases**.  This section of the JS 44 is used to reference related pending cases if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

| Robert D. Loventhal and Deborah L. Loventhal | Plaintiffs' Complaint |
|---|---|
|       Plaintiffs | |
| V. | |
| | |
| Select Portfolio Servicing, Inc. and | |
| U.S. Bank, NA | |
|       Defendants | |

**COMPLAINT**

NOW COMES the pro-se plaintiffs Robert D. Loventhal and Deborah L. Loventhal (hereinafter "Plaintiffs") filing this complaint against Defendants SELECT PORTFOLIO SERVICING INC. and U.S. BANK, NA (hereinafter "Defendants") as follows:

**NATURE OF THE ACTION**

1.       Plaintiffs brings this action against Defendants for damages resulting from breach of contract and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA".)

2.       All of the claims stated herein stem from the wrongful servicing, debt collection, and loss mitigation activities related to Plaintiffs' mortgage loan, and the ensuing wrongful foreclosure actions filed against Plaintiffs.

**PARTIES**

3.       The plaintiff Robert D. Loventhal is an individual with a residential address at 15 Hammersmith Road, Unit 13, Newport RI 02840.

1

4.      The plaintiff Deborah L. Loventhal is an individual with a residential address at 15 Hammersmith Road, Unit 13, Newport RI 02840.

5.      Plaintiffs owns the real estate and townhouse thereon known and numbered as 2609C North Greenview Ave., Chicago, Il 60614 (hereafter "the property").

6.      The Defendant, Select Portfolio Servicing, Inc. is, on information and belief, a Utah corporation with a principal place of business 3217 South Decker Lake Drive, Salt Lake City, Utah 84119. The Defendants is the loan servicer for the owner of the note and mortgage that encumbers the property. Defendants has served in that capacity for several years.

7.      The Defendant, U.S Bank, NA is, on information and belief, a Minnesota corporation with a principal place of business, 800 Nicollet Mall, Minneapolis, Minnesota 55402.  The Defendants is the owner of the note and mortgage that encumbers the property.  Defendants has served in that capacity for several years.


**JURISDICTION AND VENUE**

8.      Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 as the action arises under the laws of the United States. Jurisdiction for this cause of action is premised on diversity of citizenship, 28 U.S. C.  1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

9.      The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as the property that is the subject of this action is situated in this District, and a substantial part of the events or omissions complained of occurred in this District.

**FACTS**

11.     At the end of 2016 Plaintiffs filed a mortgage modification request seeking a modification of the terms and conditions of the mortgage encumbering the property.  Said request was in writing and forwarded to the Defendants.

12.     The modification request was based upon hardship.

13.     At the time of the modification request, Plaintiffs advised the Defendants' representatives that the property was held by Plaintiffs as an income producing property and that Plaintiffs, until 2011, resided in the property as their primary residence.

14.     Plaintiffs now reside at 15 Hammersmith Road, Unit 13 in Newport Rhode Island as their principal residence.

15.     Plaintiffs further advised Defendants that the property was rented to a tenant pursuant to a lease that was provided to Defendants along with mortgage modification.

16.     In connection with the modification request, Plaintiffs asked the Defendants' representative to confirm that Plaintiffs were entitled to obtain a modification on the property which was a rental property and whether all federal programs including HAMP were available in connection with the approval of a modification.

17.     Defendants' representatives advised Plaintiffs that the fact that the rental status of the property did not preclude a modification, that all available programs including HAMP were available to support Plaintiffs' modification, and that the lender had various internal modification programs available to support Plaintiffs' application.

18.     Plaintiffs concluded from these discussions with Defendants' representatives that a modification application for the property was supportable by all available modification programs and that Plaintiffs were justified in proceeding with their application.

19.     From the start of the application process Defendants and its representatives dealt with

Plaintiffs' application in a burdensome, deceptive and misleading way.

20.     Notwithstanding the fact that the Plaintiffs submitted a complete application to Defendants

with all required information and forms in order, Defendants continually requested the same

information previously supplied by Plaintiffs. In addition, Defendants lost information and documents

supplied by Plaintiffs leading to additional requests for provision of the same information, and

Defendants requested documents and information which was and is in no way relevant to HAMP

standards or the standards of any external or internal modification program. Significantly, Defendants'

underwriters on several occasions misconstrued or did not understand the content or nature of

Plaintiffs' documentary submissions causing continual arguments between Plaintiffs and Defendants

which improperly and detrimentally delayed the modification process and caused Plaintiffs significant

economic harm.

21.     Examples of Defendants' deceptive and misleading conduct towards Plaintiffs includes but is not

limited to the following:

A.  After Plaintiffs had submitted the application entitled Request for Mortgage Assistance (RMA),

    Plaintiffs were advised by Defendants' representatives that Defendants did not have several

    portions of said RMA.

B.  On January 31, 2017, Plaintiffs submitted another copy of the RMA (see exhibit 1 attached

    hereto.)

C.  In January 2017, Defendants' representatives once again advised Plaintiffs that Defendants did

    not receive the entire RMA.

D.  On February 28, 2017, Plaintiffs once again submitted a complete RMA (see exhibit 2 attached

    hereto.)

E.  In April, 2017, Defendants' representatives again advised Plaintiffs that Defendants had not received a complete RMA.

F.  On April 21, 2017 Plaintiffs once again submitted a page of the RMA that Defendants stated was missing (see exhibit 3 attached hereto.)

G.  Once again just prior to May 3, 2017, Defendants' representatives advised Plaintiffs that Defendants did not have a complete RMA.

H.  On May 3, 2017, Plaintiffs again submitted a compete RMA.  See exhibit 4 attached hereto.

I.  From the time of the original RMA submission through April 30, 2017, Defendants refused to accept Plaintiffs' proffers of monthly mortgage payments because Plaintiffs was three months behind on Plaintiffs' mortgage payments.

J.  Defendants' refusal to accept these payments along with the delays caused by Defendants' evasive and misleading behavior, led to the commencement of a foreclosure action by Defendants against the property and caused the imposition of additional charges such as legal fees.

K.   In connection with the aforesaid foreclosure action, Plaintiffs filed counterclaims against the Defendants, which deal in part with the Defendants' grossly negligent and internationally harmful conduct up to the date the filing of said counterclaims.

L.  In connection with the foreclosure action, the Plaintiffs demanded an accounting of all charges and credits made and received in connection with his indebtedness to the Defendants.  (See exhibit 5 attached hereto.)  Defendants failed, neglected and refused to supply this information in violation of state and federal law.

M.  Prior to June 5, 2017, Plaintiffs advised Defendants that Plaintiffs had executed a lease with a new tenant for the property, that the monthly rent pursuant to said lease was $5,000.00, and sent a copy of said lease to Defendants (See exhibit 6 attached hereto.)

5

N.  Plaintiffs re-confirmed the rental of the property and the value by telephone with Defendants. Defendants again confirmed that all federal and internal modification programs were open to Plaintiffs. Defendants' representatives once again reassured Plaintiffs that all federal and internal modification programs were open to Plaintiffs notwithstanding the fact that the property was held for rent.

O.  Prior to June 14, 2017, the Defendants requested submission of proof of rental income. Plaintiffs delivered the requested documentation, once again indicating to Defendants that the property was held for rent (see exhibit 7 attached hereto.)

P.  Prior to June 28, 2017, Defendants' representatives commenced asking questions about Plaintiffs' interest in a closed end real estate fund known as the New Boston Fund. Plaintiffs advised Defendants that Plaintiffs' interest in said fund was less than one tenth of one percent, which said fund was a closed end fund, over which Plaintiffs had no management control and access to information was limited to the quarterly reports sent to Plaintiffs. Plaintiffs then sent several quarterly reports to Defendants. Notwithstanding the provision of this information Defendants' representatives continually demanded that Plaintiffs supply a three-month profit and loss statement for the New Boston Fund. Plaintiffs continually advised Defendants' representatives that Plaintiffs could not give Defendants any more information than the information already supplied and that Plaintiffs had no ability to force the management of the New Boston Fund to provide any information beyond the information already provided, and that the information that provided was consistent with the fund's contractual obligations. Plaintiffs further advised Defendants that Plaintiffs could provide a three-month profit and loss statement concerning Plaintiffs' position in the New Boston Fund, and Plaintiffs did so. This position continued to be unacceptable to Defendants' representatives. Plaintiffs and Defendants' representatives argued about this issue from June through August 2017, creating

6

additional delay and addition cost to Plaintiffs as a result of Defendants' evasive and misleading conduct directed toward Plaintiffs (see exhibits. 8, 9, 10, 11, 12, and 13 attached hereto.)

Q. Prior to September 7, 2017, Defendants commenced requesting information provided on other previous occasions concerning proof of rental income. Plaintiffs properly advised Defendants of said information, but Defendants continued to request the same information between September 7, 2017, and October 4, 2017 (see exhibits 14, 15 and 16 attached hereto.) This delay again caused economic harm to Plaintiffs in the form of additional interest, late fees and legal fees charged against Plaintiffs' foreclosure file.

R. Just prior to November 5, 2017, Defendants' representatives commenced asking questions that had previously been answered by Plaintiffs concerning the use of Mrs. Loventhal's social security receipts. Plaintiffs explained that said social security receipts of $699.00 per month were used for household expenses or saved by Mrs. Loventhal at her discretion (see exhibit 17 attached hereto.) Although this information was and is precisely accurate, Defendants' representatives were not satisfied with this answer, and repeatedly asked for a further explanation. At the end of November in 2017, Plaintiffs finally satisfied the Defendants' representatives concerning their questions about Mrs. Loventhal's social security receipts and in that telephone call Plaintiffs were advised by Defendants' representative that the file was now complete and that it would be evaluated for modification.

S. On December 1, 2017, Plaintiffs called Defendants to inquire about the status of their modification application because the previous day Plaintiffs received a letter from Defendants indicating that more information had been requested (Exhibit 18). However, the nature of the information requested was not stated and left Plaintiffs unclear as to what information to provide or whether the file was indeed complete as Plaintiffs had been advised.

T.  The December 1, 2017, letter is one of many such letters received by Plaintiffs which state that more information is needed to properly evaluate a modification file but which do not state the nature of the information requested.  The nature of the letters received by Plaintiffs are false and deceptive and unfairly and unreasonably harm borrowers such as Plaintiffs.  Further, advising Plaintiffs that the modification file is complete and then sending a letter indicating that that the file is incomplete but failing to specify what information is still missing is unfair and deceptive and unfairly and unreasonably harms borrowers such as Plaintiffs.

U.  Another example of this practice is Defendants' advice to Plaintiffs on December 21, 2107, that the file was complete and that final evaluation would be forthcoming, which advice is confirmed by letters to Plaintiffs dated December 21 and 22, 2017 (attached hereto as exhibits 19 and 20.) Notwithstanding these letters, Defendants sent Plaintiffs additional letters which stated that more information was required (Exhibits 21 and 22). Particularly, requested information that had been provided to Defendants on at least two prior occasions.

V.  Following the receipt of exhibits 19, 20, 21 and 22, Plaintiffs called the Defendants' ombudsman and spoke to a person named Patricia Prado.  Ms. Prado was advised of Plaintiffs' complaints and she said that she would speak to the applicable underwriters evaluating Plaintiffs' file.  She did so and told Plaintiffs that the she had been advised that the file was complete.  Plaintiffs called again the next day, and Ms. Prado told Plaintiffs that the file was not compete and that the underwriters needed information specifying the amount of the Plaintiffs' HOA fees on Plaintiffs' two properties, information that Plaintiffs had provided to Defendants several times in the past.  Plaintiffs again provided the information.

W.  The worst example of Defendants' deceptive and misleading conduct towards Plaintiffs is the appraisal of the property that was conducted by Defendants in December 2017.  Said appraisal resulted in an opinion of value of the property at an amount $200,000.00 less than its true value

8

and resulted in a denial of Plaintiffs' modification based upon the program standards. The failure of said appraisal resulted from the following: the choice of an appraiser who resides and works at least 100 miles from Chicago and who had no proper understanding of the Chicago market, the failure of the appraise to enter the premises, the use by the appraiser of alleged comparable properties that were not comparable (see exhibit 23). The comparable used by Defendants in said appraisal were properties that were unlike Plaintiffs' in footprint, garage space or in light of the fact that the Embassy Club area in which Plaintiffs' property is located is considered the most desirable of all areas in the Lincoln Park neighborhood of Chicago. The appraiser also did not consider as comparable the actual sale of two townhouse units adjacent to the Plaintiffs' property as well as Zillow estimates of value of other neighboring units in the Embassy Club area which units were all comparable in footprint and close to comparable in condition to Plaintiffs' unit. The appropriate comparable units all had valuations attached to them approximately $200,000.00 higher than Defendants' appraisal of Plaintiffs' unit. Defendants' appraisal also failed to consider the acquisition price of Plaintiffs' units at $960,000.00 and the estimated $100,000.00 of additions Plaintiffs spent on said unit. Indeed, the appraiser who spoke three times to Plaintiffs never asked any questions about the unit even remotely relevant to the value of same.

X. Plaintiffs complained to the Defendants' ombudsman about the valuation and sent proof of the veracity of Plaintiffs' complaints to the ombudsman. The ombudsman advised Plaintiffs that she would discuss the problem of the appraisal with the underwriters and that Plaintiffs were entitled to another appraisal. Notwithstanding this advice, the Plaintiffs were not provided with another appraisal and their modification application was denied on December 28, 2017, with the erroneous valuation being a prominent basis for said denial.

Y.   The denial (Exhibit 24) is based on false information such as: the valuation of the property, ignoring the fact that the rent received by Plaintiffs, $5,000.00, is sufficient in and of itself to justify a modification where the modified mortgage payment will be approximately $2,500.00, and further, the denial, states that Plaintiffs are ineligible for a modification because the property is not Plaintiffs' principal residence. These reasons for denial of the modification are in direct conflict with Defendants' numerous promises to Plaintiffs that the fact that the property is a rental property does not disqualify same from being considered under all applicable modification programs.

22.   The harmful conduct of the Defendants was undertaken with the purpose of an intended delay in the processing of the Plaintiffs' modification application so as to allow the successful conclusion (in favor of Defendants) of Defendants' foreclosure action in Illinois state court.

23.   Defendants' underwriters delayed and blocked Plaintiffs' modification application by placing barriers in front of Plaintiffs that would result either in Plaintiffs withdrawing said modification application or the delay of the finalization of said application until Defendants could successfully foreclose on the property.

24.   Defendants' acts and omissions were made despite Plaintiffs having satisfied all requirements for the approval of a modification application. Defendants was informed on several occasions that Plaintiffs were receiving rent In the amount of at least $5,000.00 per month which fact, in and of itself, satisfies the requirements of a modification application.

25.   In connection therewith, the Defendants' acts and omissions willfully caused Plaintiffs harm including but not limited to the potential loss of the property and Plaintiffs' ability to lease the property.

26.   By soliciting a modification application from Plaintiffs, Defendants entered into a contract with Plaintiffs that provides that in return for Plaintiffs following and complying with the terms and

conditions of the modification program, that Defendants would treat Plaintiffs fairly and in good faith

and apply to the Plaintiffs' modification application reasonable rules and standards that apply to federal

and/or internal modification programs.

27.      Defendants, by its acts and omissions, treated Plaintiffs unfairly and in violation of both state

and federal law.  Defendants' deceptive and unreasonable conduct towards Plaintiffs, has caused and

continue to cause Plaintiffs significant economic harm.

**COUNT I**
**BREACH OF CONTRACT**

28.      Plaintiffs hereby restate and re-allege the allegations contained in paragraphs 8 through 27

inclusive of this complaint and incorporates same in to Count I.

29.      By virtue of the acceptance of Plaintiffs' mortgage modification application for processing,

Plaintiffs and Defendants entered into a contract which required Defendants to process Plaintiffs'

application in accordance with appropriate standards applicable to all applicable federal and internal

standards.

30.      Defendants' processing of Plaintiffs' modification application as described in paragraph 15 of

this Complaint breached Defendants' contractual obligation as described in paragraph 19.

31.      Said breach caused Plaintiffs significant economic harm including the possible loss of the

property.


     **WHEREFORE**:  the Plaintiffs, Robert D. Loventhal and Deborah Loventhal, hereby requests the

following relief from this Honorable Court:

1.   Judgment on count 1 of this complaint in the amount of $500,000.00.

2.   A preliminary injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs'

     property located at 2609C North Greenview Ave., Chicago, Il 60614 subject to the obligation of

11

the Plaintiffs to make monthly mortgage payments in the contractually agreed to amount until the conclusion of this litigation.

3. A permanent injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs' property located at 2609C North Greenview Ave., Chicago, Il 60614.

4. That Defendants be ordered to modify Plaintiffs' note and mortgage with Defendants so as to bring Plaintiffs current on Plaintiffs' obligations to Defendants and to otherwise modify Plaintiffs' obligation to Defendants in a commercially reasonable manner.

**COUNT II**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALINGS**

32.     Plaintiffs hereby restate and re-allege the allegations contained in paragraphs 8 through 27 inclusive of this complaint and incorporates same in to Count II.

33.     By virtue of the acceptance of Plaintiffs' mortgage modification application for processing, Plaintiffs and Defendants entered into a contract as described in paragraph 19 which contract obligated the Defendants to deal with Plaintiffs fairly and in good faith in connection with the processing of said application.

34.      The actions of the Defendants were arbitrary, capricious and unreasonable and as such were unfair and taken in bad faith in violation of Defendants' obligation to Plaintiffs.

35.     Said breach of the covenant of good faith and fair dealing by the Defendants caused Plaintiffs significant economic harm including the possible loss of the property.

**WHEREFORE**:  the Plaintiffs, Robert D. Loventhal and Deborah Loventhal, hereby requests the following relief from this Honorable Court:

1. Judgment on Count I of this complaint in the amount of $500,000.00.

2. A preliminary injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs' property located at 2609C North Greenview Ave., Chicago, Il 60614 subject to the obligation of the Plaintiffs to make monthly mortgage payments in the contractually agreed to amount until the conclusion of this litigation.

3. A permanent injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs' property located at 2609C North Greenview Ave., Chicago, Il 60614.

4. That Defendants be ordered to modify Plaintiffs' note and mortgage with Defendants to bring Plaintiffs current on Plaintiffs' obligations to Defendants and to otherwise modify Plaintiffs' obligation to Defendants in a commercially reasonable manner.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**

36. The Plaintiffs hereby restate the allegations contained in paragraphs 8 through 27, inclusive of this Complaint and incorporate same into Count III.

37. The statements of the Defendants regarding the availability of modification programs to Plaintiffs, given the fact that the property was not the Plaintiffs' principal residence were made negligently as a misrepresentation of fact, and were made to induce the Plaintiffs to enter the modification program.

38. To the extent that the denial of Plaintiffs' modification application was in fact based to any extent on the fact that the property is not Plaintiffs' principal residence, the Defendants' previous statements to Plaintiffs were deliberately false or negligent misrepresentations which Defendants knew or should have known were false.

39. Plaintiffs relied on said representations made by Defendants' representatives concerning the availability of said modification programs. If Plaintiffs had known that said programs were not available Plaintiffs would have taken other steps; such as applying for a new loan with another lender. Other

13

possible actions have been cut off from Plaintiffs due to the filing of the foreclosure action. If not for the

Defendants' negligent misrepresentations, Plaintiff would have applied for a loan with another lender.

40.     The actions of the Defendants constitute at negligent misrepresentation and have damaged

Plaintiffs economically and emotionally, and continue to do harm to Plaintiffs.

**WHEREFORE:** The Plaintiffs, Robert D. Loventhal and Deborah Loventhal, hereby requests the following

relief from this Honorable Court:

1.  Judgment on Count I of this complaint in the amount of $500,000.00.

2.  A preliminary injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs'

    property located at 2609C North Greenview Ave., Chicago, Il 60614 subject to the obligation of

    the Plaintiffs to make monthly mortgage payments in the contractually agreed to amount until

    the conclusion of this litigation.

3.  A permanent injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs'

    property located at 2609C North Greenview Ave., Chicago, Il 60614.

4.  That Defendants be ordered to modify Plaintiffs' note and mortgage with Defendants so as to

    bring Plaintiffs current on Plaintiffs' obligations to Defendants and to otherwise modify

    Plaintiffs' obligation to Defendants in a commercially reasonable manner.

**COUNT IV**
**INTENTIONAL MISREPRESENTATION**

41.     The Plaintiffs hereby restates the allegations contained in paragraphs 8 through 27, inclusive, of

this Complaint and incorporate same into Count IV.

42.     The statements of the Defendants regarding the availability of modification programs to

Plaintiffs, given the fact that the property was not the Plaintiffs' principal residence, were made as a

matter of fact and were made to induce the Plaintiffs to enter the modification program.

43.     To the extent that the denial of Plaintiffs' modification application was based to any extent on the fact that the property is not Plaintiffs' principal residence, the Defendants' previous statements to Plaintiffs were deliberately deceptive, false and intentionally misrepresentations, which statements Defendants knew or should have known were false.

44.     Plaintiffs relied on the representations made by Defendants' representatives concerning the availability of said modification programs.  If Plaintiffs had known that said programs were not available Plaintiffs would have taken alternative actions: such as applying for a new loan with another lender. However, other alternative actions were foreclosed to Plaintiffs, due to the filing of the foreclosure action. If not for the Defendants' intentional misrepresentations, Plaintiff would have applied for a loan with another lender.

45.     The actions of the Defendants constitute the intentional misrepresentation which have caused Plaintiffs economic and emotional harm and continue to do so.

**WHEREFORE:** The Plaintiffs, Robert D. Loventhal and Deborah Loventhal, hereby requests the following relief from this Honorable Court:

1.  Judgment on Count I of this complaint in the amount of $500,000.00.

2.  A preliminary injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs' property located at 2609C North Greenview Ave., Chicago, Il 60614 subject to the obligation of the Plaintiffs to make monthly mortgage payments in the contractually agreed to amount until the conclusion of this litigation.

3.  A permanent injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs' property located at 2609C North Greenview Ave., Chicago, Il 60614.

4.  That Defendants be ordered to modify Plaintiffs' note and mortgage with Defendants so as to bring Plaintiffs current on Plaintiffs' obligations to Defendants and to otherwise modify Plaintiffs' obligation to Defendants in a commercially reasonable manner.

**COUNT V**
**CONSUMER FRAUD UNDER ILLINOIS CONSUMER FRAUD ACT ("ICFA")**

46.     The Plaintiffs hereby restates the allegations contained in paragraphs 8 through 27, inclusive, of this Complaint and incorporate same into Count V.

47.     ICFA provides redress not only for deceptive business practices, but also for business practices that, while not deceptive, are unfair.

48.     There are five elements that must be satisfied to state of a claim under the ICAF, Defendant has by act or omission violated the ICAF and satisfied the five elements so that Plaintiffs may state a claim under the ICAF.

49.     A deceptive act or unfair practice occurred when Defendants made statements regarding the availability of modification programs to Plaintiffs.  The property was not the Plaintiffs' principal residence, Defendants were made aware of this fact and made representations to induce the Plaintiffs to enter the modification program. Defendants' statements were made in the course of conduct involving commerce.

50.      Defendants intended for Plaintiffs to rely on their deceptive statements, regarding the modification program. Defendants' statements to Plaintiffs were deliberately deceptive, false and intentionally misrepresentations which Defendants knew or should have known were false. The Defendants' denial of Plaintiffs' modification application was based on the fact that the property is not Plaintiffs' principal residence, a fact which the Defendants knew to be false.

51.     Plaintiffs relied on the representations made by Defendants' representatives concerning the availability of said modification programs.  If Plaintiffs had known that said programs were not available Plaintiffs could have taken alternative actions: such as applying for a new loan with another lender. However, this alternative action is foreclosed to Plaintiffs, due to the filing of the foreclosure action by

the current lender.  If not for the Defendants' intentional misrepresentations, Plaintiff would have applied for a loan with another lender.

52.　　The actions of the Defendants, including but not limited to the above outlined misrepresentation, have proximately caused Plaintiffs economic damages and emotional harm and continue to do so.

**WHEREFORE:** The Plaintiffs, Robert D. Loventhal and Deborah Loventhal, hereby requests the following relief from this Honorable Court:

1. Judgment on Count I of this complaint in the amount of $500,000.00.

2. A preliminary injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs' property located at 2609C North Greenview Ave., Chicago, Il 60614 subject to the obligation of the Plaintiffs to make monthly mortgage payments in the contractually agreed to amount until the conclusion of this litigation.

3. A permanent injunction restraining and enjoining the Defendants from foreclosing on Plaintiffs' property located at 2609C North Greenview Ave., Chicago, Il 60614.

4. That Defendants be ordered to modify Plaintiffs' note and mortgage with Defendants so as to bring Plaintiffs current on Plaintiffs' obligations to Defendants and to otherwise modify Plaintiffs' obligation to Defendants in a commercially reasonable manner.

The Plaintiffs,

/s/ Robert D. Loventhal
_____
Robert D. Loventhal


/s/ Deborah L. Loventhal
_____
Deborah L. Loventhal

17

# Exhibit 1

RECEIVED   02/28/2015 04:53PM
5083862607          p.22

Dec 18 17 10:51a .    Moynihan

# ROBERT D. LOVENTHAL
## LAW OFFICES
### 15 Hammersmith Road Unit 13
### Newport, Rhode Island 02840
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

January 31, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via Fax: 801-293-3936

RE: 2609C North Greenview Ave. Chicago IL 60614
   Loan No. 0016019226

Dear Sir:

Enclosed herewith please find entire rma.

Very truly yours,

Robert D. Loventhal

# Exhibit

# 2

## ROBERT D. LOVENTHAL
## LAW OFFICES

**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

February 28, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via Fax: 866 867 3019

RE: 2609C North Greenview Ave. Chicago IL 60614
    Loan No. 0016019226

Dear Sir:

As requested in connection with my modification application enclosed herewith please find updated (signature and date) RMA.

Very truly yours,

Robert D. Loventhal

# Exhibit

# 3

Dec 18 17 10:51a    Moynihan             RECEIVED  02/28/2015 04:53PM<br>                                            5083862607        p.20

# ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

April 21, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via Fax: 801-293-3936

RE: 2609C North Greenview Ave. Chicago IL 60614
    Loan No. 0016019226

Dear Sir/Madam:

    Enclosed herewith please find signed final page for our RMA. If you need anything else please advise.

                Very truly yours,

                Robert D. Loventhal

# Exhibit

# 4

RECEIVED  02/28/2015  04:53PM
5083862607                    p.17        5

Dec 18 17 10:50a        Moynihan

# ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

May 3, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
    15 Hammersmith Road Unit 13, Newport, RI 02840
    Loan No. 1012076913

Dear Sir/Madam:

As requested, enclosed herewith please find full RMA with appropriate signatures.

Very truly yours,

Robert D. Loventhal

# Exhibit

# 5

## ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
.Telefax (401) 847-0818
Email: RDLLAW99@aol.com

May 25, 2017

Ira Neville, Esq.
Law Offices of Ira Neville
175 North Franklin Street
Suite 201
Chicago IL 60606
Via email: Joeyounes@sbcglobal.net

RE: Robert D. Loventhal and Deborah L. Loventhal
    2609C north greenview ave Chicago IL 60614
    SPS Loan Servicing Loan No: 0016019226

Dear Mr. Neville:

In response to your letter seeking confirmation of the amount of the debt outstanding on the above referenced loan, please advised that my wife and I object to and disagree with the amount stated in your letter. In connection therewith please forward to me a complete loan history of all charges and credits on the above loan from July 2005 to the present. Please be advised that we expect transaction histories from all entities in the chain of loan ownership. Further, please send proof that SPS is the entity currently entitled to collect on this loan.

Very truly yours,

Robert D. Loventhal

cc: Joseph Younes, Esq.

# Exhibit

# 6

# ROBERT D. LOVENTHAL
## LAW OFFICES
### 15 Hammersmith Road Unit 13
### Newport, Rhode Island 02840
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

June 5, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
    2609C North Greenview Ave. Chicago IL 60614
    Loan No. 0016019226

Dear Sir:
        As requested enclosed herewith please find executed lease for the premises. The lease was executed June 3, 2017 and is for the period commencing July 1, 2017 through June 30, 2018. The rent is $5,000.00 per month. If you have any questions please advise

                                        Very truly yours,

                                        Robert D. Loventhal

Residential Lease

For Apartments, Condominiums, Single Family Homes, and Townhomes

© 2017 by Chicago Association of REALTORS® - All rights reserved

**This form is intended to be a binding real estate contract**

V1 2017

| Date of Lease | Term of Lease | | Monthly Rent |
|---|---|---|---|
| 6 / 3 / **2017** | **Lease Beginning Date**<br>7/1/2017 | **Lease Ending Date & Time**<br>6/30/2018 | **5000.00** |

| Leased Address (Premises): | 2609 N Greenview Unit C Chicago IL 60614 |
|---|---|

In consideration of the mutual covenants and agreements herein stated, Landlord(s) hereby leases to Tenant(s) and Tenant(s) hereby leases from Landlord(s) for use as a private dwelling only, the Premises, together with the fixtures and appliances in the premises, for the above Term of Lease, subject to all the provisions of this Lease.

| [Yes] | [No] | The following are incorporated into the Lease when indicated | |
|---|---|---|---|
| ✔ | | A Security deposit is being held by Landlord (if any) | $ 5,000.00 |
| | | Illinois Financial Institution (Name and Address) where Security Deposit shall be or is held (if any) | Bank of America |
| | ✔ | Non-Refundable Move-In Fee (if any) | $ |
| | ✔ | Pets Permitted (description of any pet permitted during lease): | |
| ✔ | | Parking included in lease (space number(s) if any): | 2 garage spots |
| ✔ | | Additional Storage Location (if any): | interior room in garage |
| | ✔ | Furnished? If yes, Furnished Rider Attached | |
| | | Rent shall include the following (check those that apply): | ✔ Water □ Electricity □ Gas □ Basic Cable □ Satellite □ Internet<br>✔ Lawn Care ✔ Snow Removal □ Other_____ |
| | | Appliances owned and provided by Landlord (check those that apply): | ✔ Refrigerator ✔ Microwave ✔ Oven/Range ✔ Dishwasher<br>✔ Washer ✔ Dryer □ Other_____ |
| | | Landlord's Property Insurer:<br>(Name, Address, and Phone of Homeowner Insurance Company): | amica insurance |
| | | Tenant's Property Insurer:<br>(Name, Address, and Phone of Renter Insurance Company): | All State, Armitage Ave, Chicago, IL (linda Kudz |

| Identification of Tenant(s): | |
|---|---|
| Name(s) | Melissa Benson |
| | |
| | |
| Telephone: | 773-354-2666 |
| Email: | benson.melissa@gene.com |

| Landlord(s) or Authorized Management Agent: | |
|---|---|
| Name(s): | Deborah Loventhal |
| | |
| Address: | 15 hammersmith road  unit 13<br>newport ri 02840 |
| Telephone: | 617-501-8285 |
| Email: | rdllaw99@aol.com |

| Name(s) of persons authorized to occupy premises: |
|---|
| Tenant and 2 children |
| |

| Person authorized to Act on Behalf Of Owner for the Purpose of Service of Process and Accepting Notices: | |
|---|---|
| Name: | |
| Address: | |
| Telephone: | |

**Additional Agreements and Covenants:**

Walls to be touched up (patched/painted).  Carpet to be professionally cleaned or replaced if needed.  First floor window treatements will be replaced with wood blinds.  Landlord hutch to stay in dining room, all other items to be removed including any items in the storage room.  Windows will be replaced throughout the unit and tenant will be given adequate notice.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed, on the day first above written.

| Tenant(s): SIGNATURE | DocuSigned by:<br>*Melissa Benson*<br>28509DB666A24A5... | Landlord(s): SIGNATURE | DocuSigned by:<br>*Deborah Loventhal*<br>F38C680FE34A492... |
|---|---|---|---|

**IMPORTANT:** This is a Chicago Association of REALTORS® form lease and is not specifically tailored to the legal requirements of your particular situation.  The applicable laws and regulations for residential leases frequently change and differ between municipalities.  It is important that you consult with an attorney prior to using this lease.

**Lead-Based Paint and Radon Disclosures** *(Separate Documents)*

Lead-Based Paint Hazard Disclosure: ☐ Applicable ☑ Not Applicable

Disclosure of Radon Hazards: ☑ Applicable ☐ Not Applicable

The parties acknowledge they have received and executed separately the above applicable disclosure(s).

Landlord: Deborah Lowenthal     Date: 6/3/2017
F38C680FE34A492...

Landlord: _____ Date: _____

Tenant: Melissa Benson     Date: 6/3/2017
28509DB666A24A5...

Tenant: _____ Date: _____

Tenant: _____ Date: _____

## Heating Cost Disclosure

The cost of heating is the responsibility of the ☑ Tenant ☐ Landlord. The average monthly cost of utility service projected by the utility providing the primary source of heat (heating supply) based on energy consumption during the most recent annual period of continuous occupancy by one or more prior occupants, current or expected rates and normalized weather by the method approved by the Illinois Commerce Commission is $ 200.00 .

**Tenant Acknowledgment** MB

## Notice of Conditions Affecting Habitability

☑ None Known
☐ See Attached

I hereby acknowledge that Landlord has disclosed any code violations, code enforcements litigation and/or compliance board proceedings during the previous 12 months for the Premises and common areas and any notice of intent to terminate utility service, copies of which, if any, are attached to the lease.

**Tenant Acknowledgment** MB

## Tenant hereby acknowledges receipt of the following:

  X   Receipt of Heating Cost Disclosure
  X   City of Chicago Building Code Violations
  X   Preventing Bedbug Infestations in Apartments Pamphlet
  X   Protect Your Family From Lead in Your Home Pamphlet
  X   Radon Testing Guidelines Pamphlet
  X   City of Chicago Residential Landlord and Tenant Ordinance Summary
  X   Residential Landlord and Tenant Ordinance Rate of Interest on Security Deposits
  ☒   Security Deposit Receipt (if applicable)
  ☒   Condominium Association Rules & Regulations (if applicable)

**Tenant Acknowledgment** MB

## LEASE COVENANTS AND AGREEMENTS

**1. Application.** Tenant covenants that all representations made in the Application for this Lease are incorporated into this Lease and made a part of it. Tenant covenants that all information contained in the Application is true and that this information was given as an inducement for Landlord to enter into this Lease, and therefore constitutes a material covenant.

**Tenant Acknowledgment** MB

**2. Tenant Inspection Prior to Occupancy: Building Code Violations.** Tenant has inspected the Premises and all common areas of the property to which Tenant has lawful access during the Lease Term, and is satisfied with their general condition and

appearance. Tenant acknowledges that there have been no representations, promises or other undertakings by Landlord, or any agent of Landlord, made to induce Tenant to enter into this Lease, except those expressly made in writing, relative to the repairs, decorating, additions to, or removal of any portion of the Premises or of the property. Tenant further acknowledges that attached hereto are copies, if any, of notices received from the City of Chicago during the twelve months prior to the date hereof concerning code violations, and copies of notices from any utility provider regarding termination of utility services.

**Tenant Acknowledgment** MB

**3. Tenant Responsibility Regarding Bed Bug Infestation.** Tenant shall be responsible for all requirements and obligations set forth in the Municipal Code of Chicago deemed "Tenant responsibility" and shall be liable for any and all damages which may occur as a result of Tenant's failure to strictly abide by any requirement as set forth in the Municipal Code of Chicago concerning any duty, condition, or responsibility required of Tenant with regard to reporting, treatment, or cooperation with Landlord in regards to Bed Bug infestation.

**Tenant Acknowledgment** MB

**4. The Rent.** Tenant shall pay the Monthly Rent to Landlord or Landlord's agent on the first day of each month as set forth herein.

**5. Late Fee.** The Monthly Rent shall be automatically increased $10, plus 5% of the amount by which the Monthly Rent exceeds $500, as additional rent, if received by Landlord after the 5th of the month for which it is due.

**6. Returned Bank Items.** If any check or other bank instrument tendered for payment of any tenant obligation hereunder is returned for insufficient funds, Tenant shall pay Landlord a $100 fee as additional rent. Landlord shall further have the right to demand that any such returned item be replaced by a cashier's check or money order. If Tenant tenders more than two checks or bank drafts during the term of this Lease which are returned for insufficient funds, Landlord shall have the right to demand that all future obligations hereunder be paid by cashier's check or money order.

**7. Possession.** Landlord shall deliver possession of the Premises to Tenant on the Beginning Date of the Lease. If Landlord is unable to deliver possession to Tenant on such date, this Lease shall remain in full force and effect except that the Monthly Rent shall be abated pro rata until possession is delivered, unless Tenant elects to maintain an action for possession of the Premises or, upon written notice to Landlord, elects to terminate this Lease.

**8. Security Deposit.** (If applicable). If Landlord has accepted the Security Deposit to insure Tenant's specific performance of each and every agreement, covenant, rule and obligation contained in this Lease, Landlord shall have the right, but not the obligation, to use the Security Deposit in whole or part, as a setoff against any default, either in payment of rent or other breach, which results in any loss to Landlord. If Tenant has complied with all obligations under this Lease, Landlord shall, within 45 days after Tenant vacates the Premises, refund the Security Deposit. The Security Deposit shall be held in a Federally Insured interest bearing account in a bank, savings and loan association, or other financial institution located in the State of Illinois. Interest on the Security Deposit shall be paid at the rate set by the City Comptroller for security deposits held more than six months and may be paid to Tenant either directly or by credit in the form of a rent reduction. The Security Deposit shall not be allocated by Tenant toward payment of rent.

**9. Use of Premises.** The Premises shall be occupied exclusively for residential purposes by Tenant and the other persons specifically listed in the Application and any children which may be born to or in the legal custody of Tenant during the Lease term. Unless agreed to in writing by the Landlord, no person not listed in the Application may occupy the Premises for more than a single two week period, during any single year of the Lease term. Neither Tenant nor any person in legal occupancy of the Premises with the Tenant shall perform nor permit any practice which could cause damage to the reputation of the building or Landlord, be injurious thereto, illegal, immoral, or increase the rate of insurance on the property. At no time during the Term of this Lease shall more persons reside in the Premises than would be permitted by the applicable building and/or zoning codes for the City of Chicago. Further, at no time during the Term of this Lease shall Tenant enter into short-term subleases, rooms for rent, or Air Bed & Breakfast agreements or leases. Such agreements will be considered a breach of Lease and cause for termination.

**10. Tenant Maintenance Obligations.** Tenant shall maintain the Premises in a clean, presentable and safe condition at all times and in accordance with all health, safety and building code regulations. At the termination of this Lease and upon surrender of the Premises, all fixtures, appliances and personal property of Landlord shall be in the same condition as they were on the Beginning Date, normal wear and tear excepted. Landlord may at its sole option use all or part of the Security Deposit (if any) to repair and/or replace any damage to Landlord's property caused either directly by Tenant or by Tenant's negligence.

**Tenant Acknowledgement** MB

**11. Sublease.** Tenant shall not sublease this Lease without the prior written consent of the Landlord, which shall not be unreasonably withheld. Landlord may require Tenant to enter a formal written sublease agreement. Any sublease of this Lease shall not release Tenant from the Tenant's obligation hereunder, until the full, specific performance and satisfaction of each and every agreement, covenant and obligation hereunder. Tenant shall be liable for any monetary and non-monetary breaches of this Lease caused by Tenant's subtenant.

**12. Assignment.** Tenant shall not assign this agreement without the prior written consent of Landlord

**13. No Alterations.** Tenant shall not make or cause to be made any alteration or addition to the Premises, without the prior written consent of the Landlord, and shall under no circumstances install any additional lock or security device to the Premises or the property which could impair Landlord's access.

**14. Right of Access by Landlord.** Tenant shall permit reasonable access to Landlord, and any of Landlord's invitees, agents, or contractors, in accordance with local statues and ordinances, upon receiving 2 days' notice by mail, telephone, written notice or other means designed in good faith to provide notice. Landlord shall have immediate access to the Premises in case of emergency and where repairs or maintenance elsewhere in the building unexpectedly require such access. Landlord shall give Tenant notice of such entry within two days after such entry.

**15. Right of Access to Show Premises to Prospective Tenants and Purchasers.** Landlord shall have the right to show the Premises to all prospective Tenants and purchasers, and any of Landlord's other invitees, in accordance with local statues and/or ordinances. Tenant shall permit reasonable access to Landlord upon receiving 2 days' notice by mail, telephone, written notice or other means designed in good faith to provide notice. Tenant shall be liable for any damages caused to Landlord for failure to cooperate under this provision. Tenant shall not interfere with Landlord's efforts to lease the Premises or sell the property, and Tenant shall be liable for any damages caused by breach of this provision.

**16. Holding Over.** Tenant shall be liable for double the Monthly Rent in the event that Tenant retains possession of all or any part of the Premises after the Ending Date of this Lease. Landlord may at its sole option, upon written notice to Tenant, create a month to month tenancy between Landlord and Tenant under the same terms and conditions of this Lease. Additionally, if Tenant retains possession of all or any part of the Premises after the Ending Date of this Lease and pays less than double the Monthly Rent and Landlord accepts payment, this shall become a month to month tenancy, and not a year to year tenancy, between Landlord and Tenant under the same terms and conditions of this Lease.

**17. Heat and Water.** If heat is included in the Monthly Rent, Landlord will provide the supply of heat at no additional cost to the Tenant during the winter months, at a level prescribed by statute or local ordinance. Water in reasonable quantities, strictly for residential use, is included in the Monthly Rent.

**18. Utilities.** Tenant is responsible for the provision and direct payment to utility providers for the utilities NOT included in the rent as outlined on page one of the Lease. Tenant is required to establish accounts with the utility providers no later than the Lease Beginning Date set forth on page one. Should Landlord become obligated for payment of any utility for which Tenant is liable under the terms of this Lease, such payment by Landlord shall become an additional rent payment due and payable by Tenant.

**19. Damages and Negligence.** Tenant shall be liable for any damage done to the premises as a result of Tenant's direct action, negligence or failure to inform Landlord of repairs necessary to prevent damage to the Premises.

**20. Abandonment.** The Premises shall be deemed abandoned when the criteria set forth in the Chicago Residential Landlord/Tenant Ordinance have been met, and Landlord shall have the right to relet the Premises and dispose of Tenant's possessions in the manner prescribed by law.

**21. Notices.** Any legal notice or demand may be served by tendering it to any person thirteen years old or older residing on or in possession of the Premises; or by certified mail addressed to the Tenant, return receipt requested; or by posting it upon the Premises door, if no authorized person under the Lease is in possession of the Premises. Further, except when a statue or ordinance requires notice to be sent by a particular means, Tenant agrees that all Tenant and building notices may be delivered by electronic communication (e-mail) to any e-mail address listed on page 1 for Tenant. This is including but not limited to, late rent notices, notices of entry, fine notices, building maintenance updates, and lease renewal options. Tenant agrees to inform Landlord immediately in writing of any email address change.

**22. Damage or Destruction.** If the Premises or any part of the property is destroyed or damaged to an extent that makes the Premises uninhabitable, this Lease may be terminated in accordance with applicable statutes or ordinances. In such an event, Landlord does not undertake any covenant to repair or restore the Premises to a habitable condition.

**23. Tenant's Personal Property.** Except as provided by applicable law, Landlord shall not be responsible for the loss of any of the Tenant's personal property in the Premises or any part of the building. Tenant shall obtain insurance sufficient to cover all potential losses.

**24. Landlord's Title.** Tenant shall commit no act which could in any way encumber Landlord's title to the property of which the Premises forms a part. In the event that Tenant does create any encumbrance against the title, it shall be cured within five days after demand by Landlord. Any encumbrance created by Tenant shall constitute a material breach of this Lease. Tenant shall be liable to Landlord for all costs, damages and legal fees incurred as a result of any breach of this provision, to the extent permitted by statute or local ordinance or, in the absence thereof, as incurred by Landlord.

**25. Legal Expenses.** Tenant shall be liable for all legal fees and costs incurred by Landlord as a result of Landlord's efforts to enforce any provision of this Lease, to the extent permitted by court rules, statute or local ordinance or, in the absence thereof, as incurred by Landlord.

**26. Litigation Escrow.** In the event that Tenant withholds rent in excess of that allowed by statutes or local ordinance, and Landlord institutes a lawsuit in Forcible Entry and Detainer to regain possession of the Premises, or in contract to enforce any provision of this Lease, Tenant shall place such excess rent with the Clerk of Circuit Court, pending disposition of the lawsuit.

**27. Surrender of Possession.** Tenant shall surrender possession of the Premises and return the keys to the Landlord or Landlord's agent, immediately upon expiration of this Lease, or upon termination due to Tenant's breach. Surrender of possession shall also be deemed to have occurred if the Tenant returns the keys to the Landlord prior to the expiration of this Lease.

**28. Subordination of Lease/Estoppel.** This Lease is subordinate to all mortgages upon the property of which the Premises forms a part, either in place at the time of Lease execution, or which may be placed upon the property at any time during the term of this Lease. Tenant shall execute any estoppel letter required by any mortgage lender or purchaser of the property, relative to the affirmation of Tenant's Lease status.

**29. Eminent Domain.** If all or part of the Premises or the property of which the Premises forms a part is condemned, expropriated or otherwise regulated by any governmental authority in a manner which would prevent lawful occupancy, this Lease shall be terminated.

**30. Heirs and Assigns.** All of the promises, covenants and agreements and conditions contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of Landlord and Tenant.

**31. Acceptance of Rent after Tenant Breach.** Except where a breach is for non-payment of rent, Landlord may accept rent after a Tenant breach and the rent will be retained for use and occupancy of the Premises and shall not serve to extinguish Landlord's rights or remedies relative to any lawsuit that may be filed or in progress at the time of the Tenant breach.

**32. Time of the Essence.** Time is of the essence for the payment of rent and the performance of each and every covenant, term, agreement and condition of this Lease, and Tenant shall be held in strict compliance with same.

**33. Severability.** In the event that any provision, paragraph, rule or covenant contained in this Lease is deemed invalid or unenforceable, all remaining portions of this Lease shall survive and be construed in their entirety.

**34. Landlord's Remedies.** All rights and remedies granted to Landlord hereunder shall be deemed distinct, separate and cumulative and the exercise of one or more thereof shall not waive, extinguish or preclude the exercise of any other right or remedy, unless same is specifically prohibited by court rules, statute or local ordinance. Tenant shall be required to comply strictly with all provisions, covenants and agreements hereunder, and no waiver shall be implied from Landlord's failure to exercise any of its rights or remedies.

**35. No Additional Energy Draining Devices.** Tenant is prohibited from installing any appliance or device to draw electricity, gas, or any other form of energy from any part of the property other than the Premises. Tenant shall further not install any devices which are not deemed ordinary household appliances or fixtures.

**36. Storage.** Tenant shall not be entitled to storage space outside the Premises, unless additional storage is specified on page one.

**37. Joint and Several Liability.** All persons executing this Lease shall be jointly and severally liable for the performance of each and every agreement, covenant and obligation hereunder.

**38. Re-Keying of Locks upon Prior Tenant Vacating.** Tenant shall have the right to change or re-key the lock(s) to the Premises, and shall upon request immediately provide Landlord a copy of the key to the new lock. In the event that Tenant fails to give Landlord the new key upon Landlords request, such failure shall be deemed an act by Tenant of Material Non-Compliance under the terms of this Lease.

**39. Criminal Activity by Tenant.** If Tenant(s) or occupant(s), visitors, or guests on one or more occasions, uses or permits the use of the leased premises for the

MB

DocuSign Envelope ID: CA854384-A072-4089-B979-290CDDE95FEF

commission of a felony or Class A misdemeanor under the laws of Illinois, Landlord shall have the right to void the lease and recover the leased premises.

**40. Rules and Regulations of Condominium/Homeowners Association.** If the premises is a condominium or part of a Homeowners Association, Tenant (and any person occupying the premises and any of Tenant's guests, invitees, and/or assigns) shall comply at all times with any and all rules, regulations, bylaws, easements, declarations, covenants, restrictions, directions, and/or other provisions of the Condominium/Homeowners Association for the leased Premises. Tenant (and/or Tenant's assigns) does not obtain any voting rights of Landlord with respect to any matters for which a vote is held by or on behalf of the Condominium/Homeowners Association.

# RULES AND REGULATIONS

1. Unless permitted on page one, no animals are permitted on the property and in the Premises without Landlord's prior written consent, which consent is deemed a license revocable with 10 days written notice by Landlord.

2. Entry ways, passages, public halls and common areas may not be obstructed in any way, and may not be used for recreation, congregation or play, or in any manner that might endanger any occupant, invitee or licensee of the building.

3. All deliveries, except for small packages and mail, must be made through the rear or service entrance, or a special entrance designated for special deliveries.

4. Tenant shall not permit anything to be thrown out of the windows or from the balconies of the building.

5. No vehicle or bicycle is allowed in the Premises, building or any common area of the property, unless there is a specific area designated for same.

6. Incinerators and waste receptacles shall be used in accordance with posted signs, and all items placed therein shall be neatly packaged and deposited. No explosive device or any parcel or item shall be deposited therein which could cause danger.

7. No sign or advertisement shall be placed in, around or upon any area of the Premises or building without prior written consent of the Landlord, which consent shall constitute a license revocable immediately upon written notice of the Landlord.

8. No items of personal property shall be placed in, around or upon any common area of the building.

9. No noise or other sound is permitted which disturbs the other occupants from quiet enjoyment of their apartment or common areas of the property.

10. No cooking, baking or similar activity is permitted outside the kitchen area, except when Barbeque grills are allowed on the balcony of an apartment. However, any liability or loss arising from the use or operation of a Barbeque grill shall be borne by Tenant.

11. No vertical or horizontal projection, machinery, device or receiver of any type, including satellite dishes, shall be attached in, around or upon any part of the Premises or the property without Landlord's written consent.

12. No unsightly or unsanitary practice which could undermine the sanitation, health or appearance of the building interior or exterior shall be permitted.

13. No activity carried on within the Premises or common areas of the property will be permitted which threatens the health, safety or property of any building occupant, or of Landlord.

14. Plumbing and electrical facilities in the Premises shall be maintained diligently and neatly at all times.

15. The use of water furniture is prohibited.

16. If the building is served by an elevator, Tenant must reserve move-in and move-out times in accordance with Landlord's policies.

18. These Rules and Regulations are not exhaustive and may be supplemented or modified from time to time upon written notice to Tenant.

**Guaranty:** On_____, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned Guarantor hereby guarantees the payment of rent and the performance by Tenant, Tenant's heirs, executors, administrators, successors or assigns of all covenants and agreements of this Lease.

Guarantor: _____

Guarantor Information:

| Name | |
|------|--|
| Address | |
| Phone | |
| Email | |

Tenant Acknowledgement

DS
*MB*

DocuSign Envelope ID: CA854384-A072-4089-B073-2900CDDF95FF

# Preventing BED BUG Infestations in Apartments



**B**ed bugs can be found in homes, apartments, hotels, schools, dormitories, shelters, offices and other places. This brochure provides information on bed bugs and what you should do if you have or suspect you have a bed bug infestation in your apartment. It also describes your rights and responsibilities as a tenant.

## Why is this brochure being provided to me?

In 2013, the City of Chicago passed an ordinance to help address the growing problem of bed bugs. This ordinance provides that landlords and tenants share the responsibility in preventing and controlling bed bug infestations. Further, the ordinance requires that landlords provide an informational brochure on bed bugs to tenants. This informational brochure, developed by the Chicago Department of Public Health, is intended to meet this requirement.

## What are bed bugs?

Bed bugs are small, flat, wingless insects. They feed on blood and can be a nuisance for individuals. They are named for their tendency to live on mattresses or other parts of a bed.

## What do bed bugs look like?

Adult bed bugs are roughly the size, shape and color of an apple seed: 1/4 of an inch in length and light or reddish-brown in color. Immature forms of bed bugs are smaller and lighter in color. Eggs are tiny and white. You should be able to see the adult form with your naked eye, but may need a magnifying glass to see the immature forms or eggs. Please refer to the website listed at the end of this brochure for pictures of bed bugs.

## Where do bed bugs live?

Bed bugs can be found anywhere people sleep, sit or lay down. They can be found on mattresses and box springs, especially near the piping, seams and tags, and in cracks and crevices of head boards and bed frames. They can also be found in other furniture, especially in the seams and zippers of chairs and couches, in the folds of curtains, in drawer joints, in electrical outlets, behind picture frames and in other tight spaces.

1

**HEALTHY CHICAGO**
CHICAGO DEPARTMENT OF PUBLIC HEALTH

Tenant Acknowledgement

MB

## How can bed bugs get into an apartment?

Bed bugs can get into an apartment by hitching a ride on mattresses or other bedding, furniture, clothing and baggage. Once in an apartment, they can crawl from one room to another, or get into an adjacent apartment by crawling through small cracks or holes in walls or ceilings or under doors. Because bed bugs do not have wings, they cannot fly into or around your apartment.

## What can I do to prevent bed bugs from getting into my apartment?

Bed bugs can be found most anywhere, so ALWAYS be aware of your surroundings. Always check furniture and bedding, especially those bought secondhand, for signs of bed bugs before you buy them. NEVER bring items that someone else has disposed of into your apartment, as these items may be infested with bed bugs. When returning home from travel within or from outside the U.S., ALWAYS inspect your luggage carefully for signs of bed bugs before you bring the luggage into your apartment.

## What else can I do to prevent a bed bug infestation?

Reduce clutter, especially in bedrooms. Store unused items in sealed containers or plastic bags. Wash and dry bedding often. Check beds and furniture for signs of bed bugs. Purchase mattress and box spring covers.

## Do bed bugs transmit disease?

No, bed bugs are not known to transmit disease.

## Are there other health concerns related to bed bugs?

Yes. Their bites, like those of other insects, may cause an allergic reaction with swelling, redness and itching. Their presence may cause people to be anxious and lose sleep.

## How do I know if I have a bed bug infestation in my apartment?

Though bites may be an indicator of a bed bug infestation, they are generally a poor one as not all people will react to bed bug bites or the bites may be due to other reasons. The best indication of an infestation is to look for physical signs of bed bugs such as live or dead bed bugs, eggs or eggshells or tiny dark spots or reddish stains on mattresses or other places where bed bugs live.

2

## What should I do if I suspect there are bed bugs in my apartment?

Under this ordinance, tenants MUST call their landlord immediately then follow-up in writing. Tenants SHOULD NOT try to get rid of the bed bugs by applying chemicals, "bug bombs" or pesticides as these do not work and could make you, your family or neighbors sick. Once a tenant has notified the landlord, wait for additional instructions from the landlord and pest management professional. Prompt notification and treatment will help prevent the further spread of bed bugs.

## Should I dispose of bedding, clothing or other materials that may be infested?

Disposing of these items is probably not necessary unless directed by a pest management professional. If there are items that do need to be disposed of, do so carefully by sealing them in plastic bags so as to not spread bed bugs further. The ordinance prohibits the recycling of any bed bug infested materials and requires that any bed bug infested materials be totally enclosed in a plastic bag and labeled as being infested with bed bugs when disposed.

## What should I do with any linens or clothes that may be infested?

- Wash all linen and other infested materials (including clothing) in hot water, then after drying the clothes, keep them in the dryer and dry for an additional 20 minutes on the highest setting.
- Put un-washable or "dry clean only" materials in the dryer on the highest setting for at least 20 minutes.
- If you have to launder in a common area of the building or at a laundromat, make sure all items are enclosed in a bag before leaving your apartment to prevent the further spread of bed bugs.
- Once all these materials are laundered and dried, seal them in clean bags so bed bugs can't re-infest them.

## What are my responsibilities as a tenant under this ordinance?

Tenants have two main responsibilities under this ordinance:

1) Notify your landlord within 5 days of suspecting a bed bug infestation;
2) Cooperate with the landlord by adhering to the following:

3

Tenant Acknowledgement

MB

- Don't interfere with an inspection or with a treatment.
- Grant access to your apartment for an inspection or a treatment.
- Make the necessary preparations, as instructed by your landlord or a pest management professional, prior to an inspection or a treatment.
- Dispose of any items that a pest management professional has determined can not be treated or cleaned.
- Enclose in a plastic bag any personal property that will be moved through any common area of the building, or stored in any other location.

**Are there any exemptions to these tenant responsibilities?**

Yes. The ordinance exempts tenants who live in an assisted living or shared housing establishment, or similar living arrangement, where the establishment is required to provide the tenant assistance with activities of daily living or mandatory services. In such cases, the landlord is responsible for making the necessary preparations and removing or disposing of any personal property.

**What penalties can a tenant face for not complying with these requirements?**

The ordinance allows the city to issue fines to tenants for not complying with these requirements. Fines can go as high as $2,000 for a third offense. Landlords can not fine tenants.

**What are my rights as a tenant under this ordinance?**

Landlords can't retaliate against a tenant if the tenant:

- Complains of a bed bug infestation to a governmental agency elected representative or public official charged with responsibility for enforcement of a building, housing, health or similar code.
- Complains of a bed bug infestation to a community organization or to the news-media.
- Seeks the assistance of a community organization or the news-media to remedy a bed bug infestation.
- Asks the landlord to provide pest control measures.
- Testifies in court concerning any bed bug infestation.

**What are my landlord's responsibilities under this ordinance?**

Landlords have three main responsibilities under this ordinance:

1) Educate tenants about bed bugs by providing this brochure when tenants sign a new or renew an existing lease or other rental agreement.

4

2) Notify tenants prior to any inspection or treatment of their apartment for bed bugs and provide instructions for preparing the apartment.
3) Get rid of the bed bug infestation by providing pest control services by a pest management professional and paying for this service.

**How much time does a landlord have to provide a pest management professional?**

The ordinance allows landlords up to 10 days to have a pest management professional come to inspect your apartment.

**Does the ordinance require any specific type of inspection or treatment?**

If bed bugs are in an apartment, there is a chance they may be found in additional apartments in that same building, especially those closest to the apartment with the bed bugs. As a result, the apartments on either side and directly above and below the apartment with the bed bugs need to be inspected and if necessary, treated. Treatment will only occur if bed bugs are found.

**Do these requirements apply to condominiums or cooperative building:**

Yes, but only to units that are being rented.

**What penalties can a landlord face for not complying with these requirements?**

The ordinance allows the city to issue fines to landlords for not complying with these requirements. Fines can go as high as $2,000 for a third offense.

**What should I do if my landlord is not responsive?**

If you suspect there are bed bugs in your apartment, call your landlord immediately and follow-up in writing. Give your landlord up to 10 days to have a pest management professional come to inspect your apartment. If your landlord is not responsive, call 311 and file a complaint.

5

MB

DocuSign Envelope ID: CA954384-A072-4089-B979-2900CDDE95FF

Additional information, including a copy of the ordinance, can be found at:

**www.cityofchicago.org/health**

Follow us on Twitter & Facebook

 **@ChiPublicHealth**

 **/ChicagoPublicHealth**



**HEALTHY** CHICAGO

CHICAGO DEPARTMENT OF PUBLIC HEALTH

Tenant Acknowledgement

MB

# Radon Testing Guidelines for Real Estate Transactions

Because of the unique nature of real estate transactions, involving multiple parties and financial interests, the U.S. Environmental Protection Agency (U.S. EPA) designed special protocols for radon testing in real estate transactions. The Illinois Emergency Management Agency (IEMA)-Division of Nuclear Safety has adapted these protocols to conform with its radon regulations. These options are listed in simplified form in the table below.

## Recommendations for Real Estate Transactions

IEMA strongly recommends that ALL buyers have an indoor radon test performed prior to purchase or taking occupancy, and mitigated if elevated levels are found. It is not in the best interest of the buyer or seller to rely on a radon measurement performed by anyone other than a licensed measurement professional or technician. Elevated radon concentrations can easily be reduced by a qualified, licensed radon mitigator.

## Test Options for Real Estate Transactions

Conduct a short-term radon test in each of the lowest structural areas of the home. For example, if the house has one or more of the following foundation types, e.g., basement, crawl space, slab-on-grade, a test in each area is required for licensed professional measurements.

## What to Look for in Short-Term Real Estate Testing Options

| Option | Detector Location | What to do Next |
|---|---|---|
| **Simultaneous** Two short-term tests, 48 hours or longer, performed at the same time. | Two detectors, four inches apart, in each of the lowest structural areas suitable for occupancy. | Fix the home if the average of the two tests is 4 picoCuries per liter (pCi/L) or more. |
| **Continuous Monitor Test** One test 48 hours or longer, performed with an active continuous monitor that integrates and records radon levels hourly. | Continuous monitor placed in each of the lowest structural areas suitable for occupancy | Fix the home if the average radon level is 4 pCi/L or more. |

Short-term tests may last between two and 90 days. Most last between two and seven days. Tests between seven and 90 days are usually impractical for real estate transactions. Examples of short-term detectors used in real estate testing include: activated charcoal canisters, charcoal liquid scintillation vials, electret chambers and continuous radon monitors.

### If your tests don't agree, contact the IEMA-Division of Nuclear Safety

If your simultaneous or sequential tests are not in agreement (or if you're not sure whether or not they agree), contact the IEMA-Division of Nuclear Safety Radon Program or your licensed radon measurement professional.



### When do you average radon test results?

The only time radon test results can be averaged is when two test results are placed simultaneously. Test results from different areas, such as above the crawl space and in the basement, are considered two different tests. Results are each independent of the other and are reported independently, such as basement result of 4.2 pCi/L and 1st floor room crawl space result of 6 pCi/L. When an elevated radon level in any one of the lowest structural areas, the recommendation is to fix the home.

**Interference with successful completion of a radon measurement is illegal in Illinois.**

Rev. 12 9/2007 (IEMA 018)

---

## IEMA-Division of Nuclear Safety Recommendations for Real Estate Radon Measurements

- Hire a licensed radon measurement professional.
- Be sure that IEMA-Division of Nuclear Safety Radon Program radon testing protocols are followed.
- Contact the IEMA-Division of Nuclear Safety Radon Program if you are uncertain about anything regarding radon testing. www.radon.illinois.gov

### Disclosure of Radon Information

The Illinois Radon Awareness Act and the Illinois Real Property Disclosure Act requires that a seller of a home disclose information if aware of unsafe concentrations of radon in the home. The acts do not require that testing or remediation work be conducted. However, many relocation companies and lending institutions, as well as home buyers, request a radon test when purchasing a house. Sellers, sellers agents and brokers are cautioned to err on the side of full disclosure of material facts prior to entering into a purchase agreement.

### When Testing

Be aware that any test lasting less than a week requires closed-house conditions. Closed-house conditions mean keeping all windows closed, keeping doors closed except for normal entry and exit, and not operating fans or other machines which bring air in from outside (except for fans that are part of a radon reduction system, or small exhaust fans that operate for only short periods of time).
- Before Testing: Begin closed-house conditions at least 12 hours before the start of the short-term test.
- During Testing: Maintain closed-house conditions during the entire duration of the short term test, especially for tests less than one week in duration. Operate home heating or cooling systems normally during the test. For tests lasting less than one week, only operate air conditioning units that recirculate interior air.

Note that professional measurement licensees are required to post Radon Measurements in Progress Notifications at every building entry.

### Where the test should be conducted

Place the detector or detectors in each lowest area suitable for occupancy, such as:
- a family room, living room, den, playroom, bedroom, workshop, or exercise room.
- in the lowest level suitable for occupancy, even if it isn't currently used but could be, without renovating.

For instance, if the house has one or more of the following foundation types, e.g., basement, crawl space, slab-on-grade, a test should be performed in the basement and in at least one room over the crawlspace and slab-on-grade area. If an elevated radon concentration is found and confirmed in one of these areas, fix the house.

### DO NOT MEASURE:

- in the kitchen, laundry room and bathroom (because fan systems and humidity may affect some detectors); or
- in crawl spaces, on floor or wall cracks, or right next to a sump pump, as this may cause a false high reading.

### The detector should be placed:

- in an area where it will not be disturbed;
- at least three feet from doors and windows to the outside;
- at least one foot from exterior walls;
- 20 inches to 6 feet from the floor;
- at least four inches away from other objects horizontally and directly above the detector;
- away from drafts; and
- four feet from heat, fireplaces, furnaces, and away from direct sunlight and areas of high humidity.

### If the test results show radon levels above 4 pCi/L

Contact the IEMA-Division of Nuclear Safety Radon Program. Staff can provide names and addresses of professional radon mitigators who are trained to reduce radon concentrations. We also recommend that you see our web site at www.radon.illinois.gov or contact the Radon Program for a copy of our brochure, IEMA-Division of Nuclear Safety Guide to Radon Mitigation.



### After a radon reduction system is installed

Perform an independent short-term test to ensure that the reduction system is effective. Make sure the system is operating during the entire test.

*The IEMA-Division of Nuclear Safety Radon Program can provide:*
- Information about radon and radon testing;
- Names of licensed radon measurement professionals;
- Names of licensed radon mitigation professionals trained to reduce radon.

**Call the IEMA-Division of Nuclear Safety Radon Program at: 1(800) 325-1245**

*IEMA-Division of Nuclear Safety*
*1035 Outer Park Drive • Springfield, IL 62704*
*(217) 782-1325 • TDD: (217) 782-6023*
*www.radon.illinois.gov*

Printed by the Authority of the State of Illinois    IEMA 018 6/2013 9570 Print Order 5306





**Rahm Emanuel
Mayor**

# CITY OF CHICAGO
# RESIDENTIAL LANDLORD AND
# TENANT ORDINANCE SUMMARY



**DEPARTMENT OF
PLANNING AND DEVELOPMENT**

At initial offering, this Summary of the ordinance must be attached to every written rental agreement and also upon initial offering for renewal. The Summary must also be given to a tenant at initial offering of an oral agreement, whether the agreement is new or a renewal. Unless otherwise noted, all provisions are effective as of November 6, 1986. {Mun. Code Ch. 5-12-170}

---

**IMPORTANT: IF YOU SEEK TO EXERCISE RIGHTS UNDER THE ORDINANCE, OBTAIN A COPY OF THE ENTIRE ORDINANCE TO DETERMINE APPROPRIATE REMEDIES AND PROCEDURES. CONSULTING AN ATTORNEY WOULD ALSO BE ADVISABLE. FOR A COPY OF THE ORDINANCE, VISIT THE CITY CLERK'S OFFICE ROOM 107, CITY HALL, 121 N. LASALLE, CHICAGO, ILLINOIS.**

---

### IMPORTANT NOTICE
**A message about porch safety:** The porch or deck of this building should be designed for a live load of up to 100 lbs. per square foot, and is safe only for its intended use. Protect your safety. Do not overload the porch or deck. If you have questions about porch or deck safety, call the City of Chicago non-emergency number, 3-1-1.

### WHAT RENTAL UNITS ARE COVERED BY THE ORDINANCE? {MUN. CODE CH. 5-12-010 & 5-12-020}
• Rental units with written or oral leases (including all subsidized units such as CHA, IHDA, Section 8 Housing Choice Vouchers, etc.)
**EXCEPT**
• Units in owner occupied buildings with six or fewer units.
• Units in hotels, motels, rooming houses, unless rent is paid on a monthly basis and unit is occupied for more than 32 days.
• School dormitory rooms, shelters, employee's quarters, non-residential rental properties.
• Owner occupied co-ops and condominiums.

### WHAT ARE THE TENANT'S GENERAL DUTIES UNDER THE ORDINANCE? {MUN. CODE CH. 5-12-040}
The tenant, the tenant's family and invited guests must comply with all obligations imposed specifically upon tenants by provision of the Municipal Code, applicable to dwelling units, including section 7-28-859:
• Buying and installing working batteries in smoke and carbon monoxide detectors within tenant's apartment.
• Keeping the unit safe and clean.
• Using all equipment and facilities in a reasonable manner.
• Not deliberately or negligently damaging the unit.
• Not disturbing other residents.

### LANDLORD'S RIGHT OF ACCESS {MUN. CODE CH. 5-12-050}
• A tenant shall permit reasonable access to a landlord upon receiving two days notice by mail, telephone, written notice or other means designed in good faith to provide notice.
• A general notice to all affected tenants may be given in the event repair work on common areas or other units may require such access.
• In the event of emergency or where repairs elsewhere unexpectedly require access, the landlord must provide notice within two days after entry.

### SECURITY DEPOSITS AND PREPAID RENT {MUN. CODE CH. 5-12-080 AND 5-12-081}
• A landlord must give a tenant a receipt for a security deposit including the owner's name, the date it was received and a description of the dwelling unit. The receipt must be signed by the person accepting the security deposit.
• However, if the security deposit is paid by means of an electronic funds transfer, the landlord has the option to give an electronic receipt. The electronic receipt must describe the dwelling unit, state the amount and date of the deposit, and have an electronic or digital signature. (eff. 10-8-10)
• However, the landlord may accept the payment of the first month's rent and the security deposit in one check or one electronic funds transfer and deposit such rent and security deposit into one account, if the landlord within 5 days of such acceptance transfers the security deposit into a separate account. (eff. 10-8-10)
• A landlord must hold all security deposits in a federally insured interest-bearing account in a financial institution located in Illinois. Security deposits and interest thereon shall not be commingled with the assets of the landlord.
• A written rental agreement must specify the financial institution where the security deposit will be deposited. If there is no written rental agreement, the landlord must in writing provide such information to the tenant within 14 days of the receipt of the security deposit. If the security deposit is transferred to another financial institution, the landlord must notify the tenant within 14 days of the transfer the name and address of the new financial institution. (eff. 10-8-10)



DocuSign Envelope ID: CA854384-A072-4089-B979-2900CDDF95FF

**SECURITY DEPOSITS AND PREPAID RENT {MUN. CODE CH. 5-12-080 AND 5-12-081} (cont.)**

- A landlord must pay interest each year on security deposits and prepaid rent held more than six months. (eff. 1-1-92)
- The rate of interest a landlord must pay is set each year by the City Comptroller. (eff. 7-1-97)
- Before expenses for damages can be deducted from the security deposit, the landlord must provide the tenant with an itemized statement of the damages within 30 days of the date the tenant vacates the dwelling unit.
- A landlord must return all security deposits and required interest, if any, minus unpaid rent and expenses for damages, within 45 days from the date the tenant vacates the unit.
- In the event of a fire, a landlord must return all security deposit and required interest, if any, minus unpaid rent and expenses for damages, within seven days from the date that the tenant provides notice of termination of the rental agreement. (eff. 1-1-92)
- In the event of a sale or any other disposition of residential real property by a landlord, the successor landlord is liable to the tenant for any security deposit or prepaid rent paid to the original landlord. The successor landlord must notify the tenant, in writing, within 14 days from the disposition that the deposit or prepaid rent was transferred to the successor landlord. The original landlord remains liable for the deposit or prepaid rent until the original landlord transfers the deposit or prepaid rent to the successor landlord and provides proper notice of such transfer to the tenant. (Mun. Code Ch. 5-12-080 (e) eff. 5-18-10)
- Subject to correcting a deficient amount of interest paid to a tenant on a security deposit if a landlord fails to comply with specified security deposit requirements the tenant shall be awarded damages in an amount equal to two times the security deposit plus interest. (eff. 10-8-10)

**WHAT ARE THE LANDLORD'S GENERAL DUTIES UNDER THE ORDINANCE?**

- To give tenant written notice of the owner's or manager's name, address and telephone number. {Mun. Code Ch. 5-12-090}
- Within seven (7) days of being served a foreclosure complaint an owner or landlord of a premises that is the subject of the foreclosure complaint shall disclose, in writing, to all tenants of the premises that a foreclosure action has been filed. The owner and landlord shall also notify of a foreclosure suit, in writing, before a tenant signs a lease.
  {Mun. Code Ch. 5-12-095 eff.11-05-08}
- To give new or renewing tenants notice of:
  1) Code citations issued by the City in the previous 12 months;
  2) Pending Housing Court or administrative hearing actions;
  3) Water, electrical or gas service shut-offs to the building during entire occupancy. {Mun. Code Ch. 5-12-100}
- To maintain the property in compliance with all applicable provisions of the Municipal Code. {Mun. Code Ch. 5-12-070}
- To not require a tenant to renew an agreement more than 90 days before the existing agreement terminates. (eff. 1-1-92)
  {Mun. Code Ch. 5-12-130 (i)}
- To provide a tenant with at least 30 days written notice if the rental agreement will not be renewed. If the landlord fails to give the required written notice, the tenant may remain in the dwelling unit for 60 days under the same terms and conditions as the last month of the existing agreement. (eff. 1-1-92) {Mun. Code Ch. 5-12-130 (j)}
- To not enforce prohibited lease provisions. {Mun Code Ch. 5-12-140}
- Bed Bugs-Education. For any rental agreement for a dwelling unit entered into or renewed after the effective date of this 2013 amendatory ordinance, prior to entering into or renewing such agreement, the landlord or any person authorized to enter into such
  agreement on his behalf shall provide to such tenant the informational brochure on bed bug prevention and treatment prepared by the department of health pursuant to section 7-28-860. {Mun Code Ch. 5-12-101}

**TENANT REMEDIES {MUN. CODE CH. 5-12-110}**

Minor Defects

- If the landlord fails to maintain the property in compliance with the Code and the tenant or the tenant's family or guests are not responsible for the failure, the tenant may:
  1) Request in writing that the landlord make repairs within 14 days, and if the landlord fails to do so the tenant may withhold an amount of rent that reasonably reflects the reduced value of the unit. Rent withholding begins from the fifteenth day until repairs are made; OR
  2) Request in writing that the landlord make repairs within 14 days and if the landlord fails to do so the tenant may have the repairs made and deduct up to $500 or 1/2 of the month's rent, whichever is more, but not to exceed one month's rent. Repairs must be done in compliance with the Code. Receipt for the repairs must be given to the landlord and no more than the cost of the repairs can be deducted from the rent; and also
  3) File suit against the landlord for damages and injunctive relief.

Major Defects

- If the landlord fails to maintain the property in compliance with the Code, and the failure renders the premises not reasonably fit and habitable, the tenant may request in writing that the landlord make repairs within 14 days. If after 14 days repairs are not made, the tenant may immediately terminate the lease. Tenant must deliver possession and move out in 30 days or tenant's notice is considered withdrawn. (eff. 1-1-92)

**FAILURE TO PROVIDE ESSENTIAL SERVICES (HEAT, RUNNING OR HOT WATER, ELECTRICITY, GAS OR PLUMBING) {MUN. CODE CH. 5-12-110(f)}**

- If, contrary to the lease, an essential service is not provided, or if the landlord fails to maintain the building in material compliance with the Code to such an extent that such failure constitutes an immediate danger to the health and safety of the tenant, and the tenant or tenant's family or guests are not responsible for such failure, after giving written notice, the tenant may do ONE of the following:
  1) Procure substitute service, and upon presenting paid receipts to the landlord, deduct the cost from the rent; OR
  2) File suit against the landlord and recover damages based on the reduced value of the dwelling unit; OR
  3) Procure substitute housing and be excused from paying rent for that period. The tenant may also recover from the landlord the cost of substitute housing up to an amount equal to the monthly rent for each month or portion thereof; OR



4) Request that the landlord correct the failure within 24 hours and if the landlord fails to do so, withhold the monthly rent an amount that reasonably reflects the reduced value of its premises. Rent withholding cannot start until after the 24 hours expires and applies only to days past the 24-hour waiting period; OR (eff. 1-1-92)

5) Request that the landlord correct the failure within 72 hours and if the landlord fails to do so, terminate the rental agreement. If the rental agreement is terminated, the tenant must deliver possession and move out within 30 days or the notice of termination is considered withdrawn. (eff. 1-1-92)

**Note: Remedies 4) and 5) may not be used if the failure is due to the utility provider's failure to provide service**. For the purposes of this section only, the notice a tenant provides must be in writing, delivered to the address the landlord has given the tenant as an address to which notices should be sent. If the landlord does not inform the tenant of an address, the tenant may deliver written notice to the last known address of the landlord or by any other reasonable means designed to provide written notice to the landlord. (eff.1-1-92)

### FIRE OR CASUALTY DAMAGE {MUN. CODE CH. 5-12-110 (g)}
• If a fire damages the unit to an extent that it is in material noncompliance with the Code and the tenant, tenant's family or guests are not responsible for the fire or accident, the tenant may:
1) Move out immediately, but if this is done, the tenant must provide written notice to the landlord of the intention to terminate within 14 days after moving out.
2) The tenant may stay in the unit, if it is legal, but if the tenant stays and cannot use a portion of the unit because of damage, the rent may be reduced to reflect the reduced value of the unit.
3) If the tenant stays, and the landlord fails to diligently carry out the work, the tenant may notify the landlord, in writing, within 14 days after the tenant becomes aware that the work is not being diligently carried out, of the tenant's intention to terminate the rental agreement and move out.

### SUBLEASES {MUN. CODE CH. 5-12-120}
• The landlord must accept a reasonable subtenant offered by the tenant without charging additional fees.
• If a tenant moves prior to the end of the rental agreement, the landlord must make a good faith effort to find a new tenant at a fair rent.
• If the landlord is unsuccessful in re-renting the unit, the tenant remains liable for the rent under the rental agreement, as well as the landlord's cost of advertising.

### WHAT HAPPENS IF A TENANT PAYS RENT LATE? {MUN. CODE CH. 5-12-140 (h)}
• If the tenant fails to pay rent on time, the landlord may charge a late fee of $10.00 per month on rents under $500 plus 5 percent per month on that part of the rent that exceeds $500.00 (i.e., for a $450.00 monthly rent the late fee is $10.00, for a $700 monthly rent the late fee is $10 plus 5% of $200.00 or $20.00 total) (eff. 1-1-92)

### WHAT HAPPENS IF A TENANT PAYS RENT DUE AFTER THE EXPIRATION OF THE TIME PERIOD SET FORTH IN A TERMINATION NOTICE? {MUN. CODE CH. 5-12-140 (g) CH. 5-12-130 (g)}
• If the landlord accepts the rent due knowing that there is a default in payment, the tenant may stay.

### LANDLORD REMEDIES {MUN. CODE CH. 5-12-130}
• If the tenant fails to pay rent, the landlord, after giving five days written notice to the tenant, may terminate the rental agreement.
• If the tenant fails to comply with the Code or the rental agreement, the landlord, after giving 10 days written notice to the tenant, may terminate the rental agreement if tenant fails to correct the violation.
• If the tenant fails to comply with the Code or the rental agreement, the landlord may request in writing that the tenant comply as promptly as conditions permit in the case of emergency, or within 14 days. If the breach is not corrected in the time period specified, the landlord may enter the dwelling unit and have the necessary work done. In this case, the tenant shall be responsible for all costs of repairs.

### LOCKOUTS {MUN. CODE CH. 5-12-160}
This section applies to every residential rental unit in Chicago. There are no exceptions.
• It is illegal for a landlord to lock out a tenant, or change locks, or remove doors of a rental unit, or cut off heat, utility or water service, or to do anything which interferes with the tenant's use of the apartment.
• All lockouts are illegal and the Police Department is responsible for enforcement against such illegal activity. (eff. 1-1-92) (Police Special Order 93-12)
• The landlord shall be fined $200 to $500 for each day the lockout occurs or continues.
• The tenant may sue the landlord to recover possession of the unit and twice the actual damages sustained or two months' rent, whichever is greater.

### PROHIBITION ON RETALIATORY CONDUCT BY LANDLORD {MUN. CODE CH. 5-12-150}
• A tenant has the right to complain or testify in good faith about their tenancy to governmental agencies or officials, police, media, community groups, tenant unions or the landlord. A landlord is prohibited from retaliating by terminating or threatening to terminate a tenancy, increasing rent, decreasing services, bringing or threatening to bring an eviction action, or refusing to renew a lease agreement.

### ATTORNEY'S FEES {MUN. CODE CH. 5-12-180}
• Except in eviction actions, the prevailing plaintiff in any action arising from the application of this Ordinance shall be entitled to recover all court costs and reasonable attorney's fees. (eff. 1-1-92)

### WHERE CAN I GET A COPY OF THE ORDINANCE?
• For a copy of the Ordinance, visit the Office of the City Clerk, Room 107, City Hall, 121 North LaSalle Street, Chicago, Illinois or view it at the Municipal Reference Library, Harold Washington Library, 5th Floor, 400 S. State Street, Chicago, Illinois.

*Approved by the City of Chicago, June 2013*

11250-12

# *Chicago* Rents Right

## Good Tenants, Good Landlords, Great Neighborhoods!

### For more information, please call 312-742-RENT (7368)

DocuSign Envelope ID: C4854384-A0724089-B079-2090CDDE95FF

**RESIDENTIAL LANDLORD AND TENANT ORDINANCE**
Rate of Interest on Security Deposits

Municipal Code Chapters 5-12-080, 5-12-081 and 5-12-170

- A landlord must give a tenant a receipt for a security deposit that includes the owner's name, the date it was received and a description of the dwelling unit. The receipt must be signed by the person accepting the security deposit.
- A landlord must pay interest each year on security deposits (eff. 11-6-86) and prepaid rent (eff. 1-1-92) held more than six months.
- The rate of interest that a landlord must pay is set each year by the City Comptroller. (eff. 7-1-97)
- Before a landlord can deduct expenses for damages from the security deposit, the landlord must provide the tenant with an itemized statement of the damages within 30 days of the date the tenant vacates the dwelling unit.
- Within 45 days of the date the tenant vacates the dwelling unit, a landlord must return all security deposit and required interest, if any, minus unpaid rent and expenses for damages.
- In the event of fire, a landlord must return all security deposit and required interest, if any, minus unpaid rent and expenses for damages, within seven days from the date that the tenant provides notice of termination of the rental agreement. (eff. 1-1-92)

Under Chapter 5-12 of the Municipal Code of Chicago sections 5-12-081 and 5-12-082, the City Comptroller shall calculate and announce on the first business day of each year, the rate of interest to be paid on security deposits. As of January 1, 2017 based on information from the City Comptroller's Office, the interest rate to be paid on security deposits is 0.01%. The rate is based upon the average of the rates of interest of the following types of accounts at Chase Bank, which is the commercial bank having the most branches located in the City of Chicago: Savings Account 0.01 percent, insured Money Market 0.01 percent and Six-month Certificate of Deposit (based on a deposit of $1,000) 0.01 percent.

| Security Deposit Interest Rate Jan. 1, 2017 through Dec. 31, 2017: 0.01% | |
|---|---|
| 2016: 0.01% | 2006: 1.71% |
| 2015: 0.01% | 2005: 1.01% |
| 2014: 0.013% | 2004: 0.42% |
| 2013: 0.023% | 2003: 0.52% |
| 2012: 0.057% | 2002: 0.83% |
| 2011: 0.073% | 2001: 3.10% |
| 2010: 0.073% | 2000: 2.71% |
| 2009: 0.12% | 1999: 2.63% |
| 2008: 1.26% | 1998: 3.38% |
| 2007: 1.68% | Pre-July 1997: 5.00% |

For a copy of the complete Residential Landlord and Tenant Ordinance, visit the Office of the City Clerk, Room 107, City Hall, 121 N. LaSalle St. For a copy of the Residential Landlord and Tenant Ordinance Summary, visit the Department of Planning and Development, 121 N. LaSalle St. #1000, Chicago, IL.

# Exhibit 7

Dec 18 17 10:50a          Moynihan                          RECEIVED   02/28/2015 04:53PM                 p.14
                                                                    5083862607

# ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

June 14, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
    2609C North Greenview Ave. Chicago IL 60614
    Loan No. 0016019226

Dear Sir:

    As requested enclosed herewith please find bank statements indicating first two months of the rent deposited.

                                                    Very truly yours,

                                                    Robert D. Loventhal

# Exhibit

# 8

Dec 18 17 10:50a    Moynihan             RECEIVED   02/28/2015  04:53PM                         5083862607              p.13

# ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

June 28, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via email: relationship.manager@spservicing.com

RE: Robert D. Loventhal and Deborah L. Loventhal
15 Hammersmith Road Unit 13, Newport, RI 02840
Loan No. 0016019226

Dear Sir/madam,

As requested this morning, enclosed herewith please find profit and loss for Robert D. Loventhal, Attorney for April through June 2017 and profit and Loss for my interest in the New Boston Fund from February through May 2017.

Very truly yours,

Robert D. Loventhal

Exhibit

9

Dec 18 17 10:49a        Moynihan                    RECEIVED   02/28/2015 04:53PM
                                                                5083862607              p.12

                                                                                        12

# ROBERT D. LOVENTHAL
## LAW OFFICES

**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

July 20, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
    2609C North Greenview Ave. Chicago IL 60614
    Loan No. 0016019226

Dear Sir:

On July 20, 2017 I called SPS to inquire about the state of my mortgage modification application. Once again I was told that SPS needs a three month profit and loss statement from New Boston Fund. This letter is now the fifth time that I have explained to SPS that I cannot give you a three month profit and loss from New Boston Fund because New Boston Fund is a 700 million dollar closed end fund that I own less than one tenth of one percent of and over which I have no control or ability to gain information from. Alternatively I have on July 3, 2017 provided a three month personal profit and loss statement as to my income from the New Boston Fund and I enclose herewith my statements from New Boston Fund for the first quarter of 2017.

I am quite upset with the continuing inability of SPS to understand the fact that I have given you all that I can from New Boston Fund, that I cannot get you a three month profit and loss and that even if I could it would bear no relevance to my personal financial situation given the tiny fraction of the fund that I own.

This issue is holding up the approval of my modification and I will no longer tolerate it. If this issue is not resolved forthwith I will file suit claiming that SPS is breaching the covenant of good faith and fair dealing and artificially and in bad faith holding up my modification.

Very truly yours,

Robert D. Loventhal

# Exhibit

# 10

Dec 18 17 10:49a    Moynihan    RECEIVED    02/28/2015 04:53PM
5083862607    p.10

# ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13
Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

August 1, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
2609C North Greenview Ave. Chicago IL 60614
Loan No. 0016019226

Dear Sir/Madam:

This letter is sent to you to clarify the receipt of income from the New Boston Fund. I recently forwarded to you a profit and loss statement explaining my income from NBF. To clarify again I own a very small percentage of New Boston Funds VI and VII, less than one tenth of one percent in each case. I have no control over the management or administration of any New Boston Fund. These are closed end real estate funds. I invested $300,000.00 in Fund VI in 2003 and $50,000.00 in Fund VII in 2007. Fund VI paid out income distributions and capital returns for a few years, but as of 2010 no further distributions were made and the fund is essentially insolvent. Fund VII pays out operating income each quarter and from time to time pay capital returns.

Enclosed herewith please find the New Boston Fund investor statements for the past year which cover both Funds. As you will see by examination of same there have been no distributions from Fund VI. The statements show the following distributions from Fund VII and I ask that you please accept these documents and this summary in lieu of a profit and loss statement that will simply show you a quarterly distribution from fund VII as these documents and this explanation in this case is more thorough than a formal profit and loss statement.

1. Investor Statement for April 1 2016 through June 20 2016: I received operating income of $65.03 and a return of capital of $355.86;
2. Investor Statement for July 1 2016 through October 14 2016: I received operating income of $65.02 and a return of capital of $5323.86.
3. Investor Statement for October 1 2016 through December 31 2016: I received operating income of $64.95.

Dec 18 17 10:49a          Moynihan                    RECEIVED   02/28/2015 04:53PM
                                                               5083862607              p.11

4. Investor Statement for January 1 2017 through March 31 2017: I received operating income of $155.77.

Please note that the owner of Fund VI is noted as Atlantic 21st Century Investments LLC. Atlantic, no longer active, was a limited liability company which i formed in 2003 and which held my entire interest in Fund VI. I let the company expire at the time that it became clear that Fund VI would make no further distributions. By operation of law as the sole member of the LLC i became the sole owner in my own name at the dissolution of the LLC.

I assume that this answers all of SPS' questions regarding my investment in New Boston /fund.

Very truly yours,

Robert D. Loventhal

Exhibit
11

Dec 18 17 10:49a        Moynihan                    RECEIVED   02/28/2015  04:53PM
                                                            5083862607              p.9

# ROBERT D. LOVENTHAL
## LAW OFFICES
### 15 Hammersmith Road Unit 13
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

August 8, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Via Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
    2609C North Greenview Ave. Chicago IL 60614
    Loan No. 0016019226

Dear Sir/Madam:

As requested enclosed herewith please find two months bank statements showing social security receipt and the New Boston fund material faxed to you last week. I trust that there is nothing else that SPS needs as I have been sending you material for over a year and based upon federal regulations I am qualified for a modification.

Very truly yours,

Robert D. Loventhal

Exhibit

12

# ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

August 17, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
2609C North Greenview Ave. Chicago IL 60614
Loan No. 0016019226

Dear Sir/Madam;

Enclosed herewith please find the following related to my mortgage modification application:

1. Citizens Bank Statements showing receipt of social security payments; and
2. Profit and loss statement from New Boston Fund.

Very truly yours,

Robert D. Loventhal

Exhibit

13

RECEIVED   02/28/2015 04:53PM
5083862607                    p.7

16

# Profit and Loss Statement
# Robert D. Loventhal
# New Boston Fund VII

July 1, 2016– June 30, 2017

| Period | Distribution to Robert D. Loventhal | Expenses | Net Payment to Robert D. Loventhal |
|---|---|---|---|
| July 1, 2016-September 30, 2016 | $5,388.88 | $0.00 | $5,388.88 |
| October 1, 2016-December 31, 2016 | $64.95 | $0.00 | $64.95 |
| January 1, 2017-March 31, 2017 | $155.77 | $0.00 | $155.77 |
| April 1, 2017-June 30, 2017 | $155.77 | $0.00 | $155.77 |

Dec 18 17 10:49a     Moynihan

RECEIVED   02/28/2015 04:53PM
          5083862607          p.2

# ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

December 8, 2017

Patricia Prado Ombudsman
SPS Loan Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Fax: 801-293-3943

RE: Robert D. Loventhal and Deborah L. Loventhal
     2609C North Greenview Ave. Chicago IL 60614
     Loan No. 0016019226

Dear Patricia:

As discussed this morning enclosed herewith please find my K1 for the New Boston Fund. As you can see from Part II section J my share of the fund is between 11/100 and 12/100 of one percent. Please make sure that the underwriters finally understand this point. Thank you.

Very truly yours,

Robert D. Loventhal

Exhibit

14

Dec 18 17 10:49a    Moynihan                    RECEIVED  02/28/2015 04:53PM
                                                         5083862607              p.6

# ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

September 7, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
    2609C North Greenview Ave. Chicago IL 60614
    Loan No. 0016019226

Dear Sir/Madam:

Enclosed herewith please find bank statements indicating the deposit of rent at 2609C North Greenview Ave. in Chicago.

Very truly yours,

Robert D. Loventhal

# Exhibit
# 15

## ROBERT D. LOVENTHAL
### LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

September 21, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
    2609C North Greenview Ave. Chicago IL 60614
    Loan No. 0016019226

Dear Sir/Madam:

Enclosed herewith please find Bank of America bank statements for July and August as requested.

Very truly yours,

Robert D. Loventhal

Exhibit

16

Dec 18 17 10:49a     Moynihan       RECEIVED   02/28/2015 04:53PM        p.4
                                                  5083862607

# ROBERT D. LOVENTHAL
## LAW OFFICES
### 15 Hammersmith Road Unit 13
### Newport, Rhode Island 02840
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

October 4, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119

RE: Robert D. Loventhal Loan Modification
     2609C North Greenview Ave. Chicago IL 60614
     Loan No. 0016019226

Dear Sir/Madam:

As requested on October 4, 2017, enclosed herewith please find two bank statements from Bank of America showing the deposits of rent to Bank of America for the months of August and September 2017.

The August deposit is seen on August 1. The rent is $5,000.00 per month. The tenants paid for some minor repairs and deducted those amounts from the rent.

The September deposit is seen on September. Once again, the tenant paid for some minor repairs and deducted the cost of same from the rent.

It is my understanding that you now have a complete file. If you do no I expect a call forthwith.

Very truly yours,

Robert D. Loventhal

# Exhibit 17

# ROBERT D. LOVENTHAL
## LAW OFFICES
**15 Hammersmith Road Unit 13**
**Newport, Rhode Island 02840**
Telephone (401) 846-1351
Telephone (617) 501-8285
Telefax (401) 847-0818
Email: RDLLAW99@aol.com

November 5, 2017

Select Portfolio Servicing
3217 South Decker Lake Drive
Salt Lake City, Utah 84119
Fax: 866 867 3019

RE: Robert D. Loventhal and Deborah L. Loventhal
    2609C North Greenview Ave. Chicago IL 60614
    Loan No. 0016019226

Dear Sir/Madam:

As requested, enclosed herewith please find the last three bank statements for Deborah L. Loventhal showing the receipt of her social security income. As I have explained to several representatives Mrs. Loventhal has no plan for the use of the money before it arrives. Sometimes she lets it sit in the account and sometimes she transfers it to checking to purchase household goods and supplies and/or uses the money at the super market or clothing store.

I trust that there are no more questions and that we are ready to approve the modification.

Very truly yours,

Robert D. Loventhal

Exhibit

18



November 27, 2017



ROBERT D LOVENTHAL
15 HAMMER SMITH RD UNIT 13
NEWPORT, RI 02840

**Re: Account Number:** 0016019226
    **Property Address:** 2609 N GREENVIEW AVE UNIT C
                      CHICAGO, IL 60614

Dear Customer(s):

Select Portfolio Servicing, Inc. (SPS), the mortgage servicer on the above referenced account, has received information from you or your authorized agent in connection with your assistance request. This information will be included in our review of this account. Please keep in mind that, in general, documentation must be dated within the last ninety (90) days to be considered valid. We thank you for this opportunity to assist you.

Once we have received your complete application, and any necessary third party approvals, you will be evaluated for all available loss mitigation options for which you are eligible. The results will be sent to you within thirty (30) days after we receive your complete application. This notification will provide, as applicable:

- Details of the loss mitigation program for which you are approved, including, any information on how and when you must accept the offer, which at a minimum will be 14 days.
- Details of the loss mitigation programs for which you were evaluated but not approved, including, the results of any Net Present Value (NPV) tests if applicable.
- Information on how to appeal the denial of a modification plan if applicable.

Please know that you are entitled to a copy of the property valuation report we may order in connection with any applicable account modification review. We will send the valuation report to you upon completion of the valuation.

If you have any questions, your assigned Relationship Manager, Matt Enright, can be reached toll free at 888-818-6032 Ext. 36357 or by email at Relationship.Manager@SPServicing.com.

At SPS, any of our trained servicing representatives can assist you with answers to your questions about the status or history of your account, document requirements, or any of our available loan resolution options. If you have any questions or concerns, please contact our Loan Resolution Department. Our toll-free number is 888-818-6032, and representatives are available Monday through Thursday between the hours of 8 a.m. and 11 p.m., Friday from 8 a.m. to 9 p.m., and Saturday from 8 a.m. to 2 p.m., Eastern Time.

Exhibit

19





December 21, 2017

ROBERT D LOVENTHAL
15 HAMMER SMITH RD UNIT 13
NEWPORT, RI 02840

**Account Number:**     0016019226
**Property Address:**   2609 N GREENVIEW AVE UNIT C
                        CHICAGO, IL 60614

Dear Customer(s),

Select Portfolio Servicing, Inc. (SPS), the mortgage servicer on the above referenced account, received your complete Assistance Review Application, including all required information and documentation necessary to evaluate your account for loss mitigation assistance on 12/21/2017. We expect to complete our evaluation within thirty (30) days of the date we received the complete Assistance Review Application. All options are offered at no cost to our customers and may include structured repayment plans, loan modifications, payment deferrals, or loan settlement alternatives. If your property also secures other accounts, you should consider contacting the servicer(s) of those accounts to discuss available loss mitigation options.

Although not all customers qualify for loss mitigation, we will clearly communicate with you regarding the program(s) for which you are eligible. We will evaluate your complete application for all loss mitigation options available to you and the results will be sent to you within thirty (30) days of the date we received the complete Assistance Review Application. This notification will provide:

- Details of the loss mitigation program for which you are approved, including, any information on how and by when you must accept the offer, which at a minimum will be 14 days.

- Names of all loss mitigation programs for which you were evaluated but not approved, including, the results of any modeled Net Present Value (NPV) tests if applicable.

- Information on how to appeal the denial of a modification plan if applicable.

If, during the evaluation of your application, we find that we need additional information from you, we will inform you in writing what information is necessary to complete the application. You will then have an additional thirty (30) days to provide the requested information. Once SPS receives the additional information, the evaluation process will resume and a final decision will be sent to you within thirty (30) days of receiving the additional information. Foreclosure protections could end if we do not receive the additional information as requested.

You are entitled to certain foreclosure protections because we have received a complete Assistance Review Application. We will not commence or initiate the foreclosure process prior to evaluating your complete Assistance Review Application. If we have already initiated the foreclosure process, we will not conduct a foreclosure sale prior to evaluating your complete Assistance Review Application. If a foreclosure sale has already been scheduled we will instruct our attorney to file a motion to postpone such sale. It is possible however that a court will deny the motion and the sale will proceed. If that happens we will be unable to provide loss mitigation.

You may be entitled to additional protections under State or Federal law.

Please know that you are entitled to a copy of the property valuation report we may order in connection with any applicable account modification review. We will send the valuation report to you upon completion of the valuation.



## Notice of Error or Information Request

If you believe there has been an error with the account or you require additional information, you may send a written Notice of Error or Information Request. All Notices of Error or Information Requests must be sent in writing to the address listed below, as this is our exclusive address under Federal Law for these matters. If you send your correspondence to any other address, it may not be processed in accordance with Federal law.

Select Portfolio Servicing, Inc.
PO Box 65277 Salt Lake City, UT 84165-0277

If you would like to speak with a HUD approved counselor, call the Homeowner's HOPE™ Hotline 888-995-HOPE (4673). The Homeowner's HOPE™ Hotline offers free HUD-certified counseling services and is available 24/7 in English and Spanish. Other languages are available by appointment.

Sincerely,

Select Portfolio Servicing, Inc.

**Esta carta contiene información importante concerniente a sus derechos. Por favor, traduzca esta carta. Nuestros representantes bilingües están a su disposición para contestar cualquier pregunta. Llamenos al numero 800-831-0118 y seleccione/marque la opción 2.**

**This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for that purpose.**

**Minnesota - This collection agency is licensed by the Minnesota Department of Commerce**
**New York City - Collection Agency License # 1170514**



# Exhibit 20

ⱱᴣ

 **SPS** | **SELECT**
**Portfolio**
**SERVICING, inc.**

December 22, 2017

ROBERT D LOVENTHAL
15 HAMMER SMITH RD UNIT 13
NEWPORT, RI 02840

**Account Number:**     0016019226
**Property Address:**    2609 N GREENVIEW AVE UNIT C
                        CHICAGO, IL 60614

Dear Customer(s),

Select Portfolio Servicing, Inc. (SPS), the mortgage servicer on the above referenced account, received your complete Assistance Review Application, including all required information and documentation necessary to evaluate your account for loss mitigation assistance on 12/21/2017. We expect to complete our evaluation within thirty (30) days of the date we received the complete Assistance Review Application. All options are offered at no cost to our customers and may include structured repayment plans, loan modifications, payment deferrals, or loan settlement alternatives. If your property also secures other accounts, you should consider contacting the servicer(s) of those accounts to discuss available loss mitigation options.

Although not all customers qualify for loss mitigation, we will clearly communicate with you regarding the program(s) for which you are eligible. We will evaluate your complete application for all loss mitigation options available to you and the results will be sent to you within thirty (30) days of the date we received the complete Assistance Review Application. This notification will provide:

- Details of the loss mitigation program for which you are approved, including, any information on how and by when you must accept the offer, which at a minimum will be 14 days.

- Names of all loss mitigation programs for which you were evaluated but not approved, including, the results of any modeled Net Present Value (NPV) tests if applicable.

- Information on how to appeal the denial of a modification plan if applicable.

If, during the evaluation of your application, we find that we need additional information from you, we will inform you in writing what information is necessary to complete the application. You will then have an additional thirty (30) days to provide the requested information. Once SPS receives the additional information, the evaluation process will resume and a final decision will be sent to you within thirty (30) days of receiving the additional information. Foreclosure protections could end if we do not receive the additional information as requested.

You are entitled to certain foreclosure protections because we have received a complete Assistance Review Application. We will not commence or initiate the foreclosure process prior to evaluating your complete Assistance Review Application. If we have already initiated the foreclosure process, we will not conduct a foreclosure sale prior to evaluating your complete Assistance Review Application. If a foreclosure sale has already been scheduled we will instruct our attorney to file a motion to postpone such sale. It is possible however that a court will deny the motion and the sale will proceed. If that happens we will be unable to provide loss mitigation.

You may be entitled to additional protections under State or Federal law.

Please know that you are entitled to a copy of the property valuation report we may order in connection with any applicable account modification review. We will send the valuation report to you upon completion of the valuation.



CF005                          0014233800001601020                          0016019226

If you have any questions, your assigned Relationship Manager, Matt Enright, can be reached toll free at 888-818-6032 Ext. 36357 or by email at Relationship.Manager@SPServicing.com.

At SPS, any of our trained servicing representatives can assist you with answers to your questions about the status or history of your account, document requirements, or any of our available loan resolution options. If you have any questions or concerns, please contact our Loan Resolution Department. Our toll-free number is 888-818-6032, and representatives are available Monday through Thursday between the hours of 8 a.m. and 11 p.m., Friday from 8 a.m. to 9 p.m., and Saturday from 8 a.m. to 2 p.m., Eastern Time.

### Notice of Error or Information Request

If you believe there has been an error with the account or you require additional information, you may send a written Notice of Error or Information Request. All Notices of Error or Information Requests must be sent in writing to the address listed below, as this is our exclusive address under Federal Law for these matters. If you send your correspondence to any other address, it may not be processed in accordance with Federal law.

Select Portfolio Servicing, Inc.
PO Box 65277 Salt Lake City, UT 84165-0277

If you would like to speak with a HUD approved counselor, call the Homeowner's HOPE™ Hotline 888-995-HOPE (4673). The Homeowner's HOPE™ Hotline offers free HUD-certified counseling services and is available 24/7 in English and Spanish. Other languages are available by appointment.

Sincerely,

Select Portfolio Servicing, Inc.

**Esta carta contiene información importante concerniente a sus derechos. Por favor, traduzca esta carta. Nuestros representantes bilingües están a su disposición para contestar cualquier pregunta. Llámenos al numero 800-831-0118 y seleccione/marque la opción 2.**

**This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for that purpose.**

**Minnesota - This collection agency is licensed by the Minnesota Department of Commerce**
**New York City - Collection Agency License # 1170514**



# Exhibit 21



December 21, 2017

 ROBERT D LOVENTHAL
15 HAMMER SMITH RD UNIT 13
NEWPORT, RI 02840

**Account Number:** 0016019226
**Property Address:** 2609 N GREENVIEW AVE UNIT C
CHICAGO, IL 60614

## REQUIRED INFORMATION NOTICE

Dear Customer(s):

Select Portfolio Servicing, Inc. (SPS), the mortgage servicer on the above referenced account, has reviewed your Assistance Review Application request. Although you may have received previous information regarding your request and documentation requirements, we have reviewed the information received and have determined that the submitted documentation is insufficient or information is still needed as shown on the document attached to this letter (the "**Required Information**"). Before we can begin our evaluation process, you are required to submit a complete application. We must receive the missing Required Information on or before January 20, 2018.

If we do not receive the Required Information by January 20, 2018, we may be unable to evaluate your application. If you have already provided the documents requested herein on or after the date of this letter, you may disregard this letter.

**If there is a foreclosure sale scheduled for your home in the next thirty (30) days you are required to send all documentation via overnight mail with delivery confirmation.** Please know that while we wait for you to send us the Required Information by the due date listed in this letter, your account will not be referred to foreclosure, nor will it be sold at a foreclosure sale if the foreclosure sale process has already been initiated. If a foreclosure sale has already been scheduled we will instruct our attorney to file a motion (or other similar action) to postpone such sale. It is possible however that a court will deny the motion and the sale will proceed. If that happens we will be unable to provide loss mitigation. If you are unsure if there is a sale scheduled for the property in the next thirty (30) days please contact us immediately at 888-818-6032. All documents sent via overnight mail must be addressed to:

**Select Portfolio Servicing, Inc.**
**3217 S. Decker Lake Dr Salt Lake City, UT 84119**

As noted above, in order for us to review your account for all available loss mitigation programs we require a complete application, which requires you to submit all Required Information by January 20, 2018. The missing Required Information is described in the document attached to this letter. To aid in identifying your documents, should they be sent separately or get separated, please include your account number at the bottom of all pages. You may fax, email, upload, or mail the Required Information to:

**Select Portfolio Servicing, Inc.**
**PO Box 65250 Salt Lake City, UT 84165-0250**
**Fax: 866-867-3019**
**Email: Relationship.Manager@SPServicing.com**
**Website: www.spservicing.com**



If you have any questions, your assigned Relationship Manager, Matt Enright, can be reached toll free at 888-818-6032 Ext. 36357 or by email at Relationship.Manager@SPServicing.com.

At SPS, any of our trained servicing representatives can assist you with answers to your questions about the status or history of your account, document requirements, or any of our available loan resolution options. If you have any questions or concerns, please contact our Loan Resolution Department. Our toll-free number is 888-818-6032, and representatives are available Monday through Thursday between the hours of 8 a.m. and 11 p.m., Friday from 8 a.m. to 9 p.m., and Saturday from 8 a.m. to 2 p.m., Eastern Time.

**Notice of Error or Information Request**

If you believe there has been an error with the account or you require additional information, you may send a written Notice of Error or Information Request. All Notices of Error or Information Requests must be sent in writing to the address listed below, as this is our exclusive address under Federal Law for these matters. If you send your correspondence to any other address, it may not be processed in accordance with Federal law.

Select Portfolio Servicing, Inc.
PO Box 65277 Salt Lake City, UT 84165-0277

If you would like to speak with a HUD approved counselor, call the Homeowner's HOPE™ Hotline 888-995-HOPE (4673). The Homeowner's HOPE™ Hotline offers free HUD-certified counseling services and is available 24/7 in English and Spanish. Other languages are available by appointment.

Sincerely,

Select Portfolio Servicing, Inc.

**Esta carta contiene información importante concerniente a sus derechos. Por favor, traduzca esta carta. Nuestros representantes bilingües están a su disposición para contestar cualquier pregunta. Llamenos al numero 800-831-0118 y seleccione/marque la opción 2.**

**This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for that purpose.**

**Minnesota - This collection agency is licensed by the Minnesota Department of Commerce New York City - Collection Agency License # 1170514**



# Exhibit

# 22



**SPS** |SELECT·
Portfolio
SERVICING, inc.

December 22, 2017

ROBERT D LOVENTHAL
15 HAMMER SMITH RD UNIT 13
NEWPORT, RI 02840

Re:   **Account Number:** 0016019226
      **Property Address:** 2609 N GREENVIEW AVE UNIT C
      CHICAGO, IL 60614

Dear Customer(s):

Select Portfolio Servicing, Inc. (SPS), the mortgage servicer on the above referenced account, has received information from you or your authorized agent in connection with your assistance request. This information will be included in our review of this account. Please keep in mind that, in general, documentation must be dated within the last ninety (90) days to be considered valid. We thank you for this opportunity to assist you.

Once we have received your complete application, and any necessary third party approvals, you will be evaluated for all available loss mitigation options for which you are eligible. The results will be sent to you within thirty (30) days after we receive your complete application. This notification will provide, as applicable:

- Details of the loss mitigation program for which you are approved, including, any information on how and when you must accept the offer, which at a minimum will be 14 days.
- Details of the loss mitigation programs for which you were evaluated but not approved, including, the results of any Net Present Value (NPV) tests if applicable.
- Information on how to appeal the denial of a modification plan if applicable.

Please know that you are entitled to a copy of the property valuation report we may order in connection with any applicable account modification review. We will send the valuation report to you upon completion of the valuation.

If you have any questions, your assigned Relationship Manager, Matt Enright, can be reached toll free at 888-818-6032 Ext. 36357 or by email at Relationship.Manager@SPSServicing.com.

At SPS, any of our trained servicing representatives can assist you with answers to your questions about the status or history of your account, document requirements, or any of our available loan resolution options. If you have any questions or concerns, please contact our Loan Resolution Department. Our toll-free number is 888-818-6032, and representatives are available Monday through Thursday between the hours of 8 a.m. and 11 p.m., Friday from 8 a.m. to 9 p.m., and Saturday from 8 a.m. to 2 p.m., Eastern Time.



CF004                                    0014232900035201 0200                              0016019226

## Required Information

**Documents Received but Additional Action Required**: Documents listed below have been received but have been rejected for the reasons indicated in the gray box(es).

| Documentation Type | Documentation Description |
|---|---|
| Profit and Loss Statement | **For each customer (and/or non-customer whose income is used toward mortgage-related expenses) who is self-employed:**<br>• Each self-employed customer or non-customer whose income is used toward mortgage-related expenses must provide copies of each of the most recent quarterly or year-to-date profit and loss statement, covering at least a three (3) month period, for each business owned. The statement must include the business name, income, cost of goods sold, other income, expenses, net income after expenses and period start and end dates (for example 10/1/2012 through 12/31/2012). The statement must be signed and dated. If you are no longer self-employed, please provide a copy of your cancelled business license or letter of explanation.<br>• K-1 / Tax Form 1120S or 1065B — A copy of the shareholder's share of income for self-employment income listed on Schedule E of your recent tax returns for verification of percentage of ownership |

**Action Required**
• Please contact us at 888-818-6032 regarding the document that was received, so we can provide clarification on what is needed.



# Exhibit

# 23



**RRReview**
VALUE TRUST RELATIONSHIP
www.RRReview.com
866-876-5095

| Account # | 0016019226 | Order # | 4213181 |
|---|---|---|---|
| Client | Select Portfolio Servicing, Inc. | Group ID | CY4 |
| Inspection | Interior | Occupancy | Occupied |
| Effective Date | 12/12/2017 | County | Cook |
| Owner | ROBERT LOVENTHAL | Parcel # | 14293022680000 |
| Address | 2609 N GREENVIEW AVE APT C CHICAGO IL 60614 | | |
| Correction | | | |

## General Information

| Property Type | Single Family | Housing Inventory | Stable | Tax Assessed Value | $0 | Neighborhood Low | $720,000 |
|---|---|---|---|---|---|---|---|
| Location | Urban | Property Values | Stable | Annual Property Tax | $0 | Neighborhood High | $800,000 |
| Ownership Type | Fee-simple | Land Value | $15,048 | Neighborhood Predominant | $770,000 | Typical/Distressed Marketing | 2 / 30 days |

## Listing and Sale Information

| Currently Listed | No | Current List Price | - | Last Sale Price | - | Prev. List (12 Mos.) | No |
|---|---|---|---|---|---|---|---|
| Listing Date | - | Original List Price | - | Last Sale Date | - | Prev. Sale (36 Mos.) | No |
| **Subject Comments** | Subject property is a townhouse, built in 1991 with a 2643sf of gla. Subject is located in a single family neighborhood. Subject c (See Addendum) | | | | | | |

## Comparable Information

| | Subject | Sale 1 | Sale 2 | Sale 3 | Listing 1 | Listing 2 | Listing 3 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Address | 2609 N GREENVIEW AVE APT C , 60614 | 2709 N JANSSEN AVE , 60614 | 2732 N SOUTHPORT AVE UNIT B , 60614 | 2733 N GREENVIEW AVE UNIT B , 60614 | 2671 N GREENVIEW AVE UNIT B , 60614 | 2638 N HARTLAND CT UNIT B , 60614 | 2730 N JANSSEN AVE UNIT B , 60614 |
| Proximity | - | 0.14 Miles | 0.18 Miles | 0.14 Miles | 0.08 Miles | 0.35 Miles | 0.16 Miles |
| DataSource | Tax Records | MLS:09672253 | MLS:09646089 | MLS:09675444 | MLS:09797844 | MLS:09797054 | MLS:09808798 |
| HOA | - | - | - | - | - | - | - |
| Fair Market Rent | $5,134 | $5,000 | $5,100 | $5,200 | $5,100 | $5,200 | $5,250 |
| Sale Type | - | Arms Length | Arms Length | Arms Length | Arms Length | Arms Length | Arms Length |
| Orig List Price | - | $749,000 | $799,900 | $799,900 | $729,000 | $748,000 | $799,000 |
| Current List Price | - | | | | $729,000 | $748,000 | $799,000 |
| Orig List Date | - | 06/29/2017 | 06/02/2017 | 07/05/2017 | 11/09/2017 | 11/08/2017 | 11/29/2017 |
| Sale Price | - | $750,000 | $777,500 | $785,000 | | | |
| Concessions | - | $0 | $0 | $0 | - | - | - |
| Sale Date | - | 08/18/2017 | 07/27/2017 | 08/25/2017 | | | |
| Financing | - | Conventional | Conventional | Conventional | - | - | - |
| DOM | - | 50 | 55 | 51 | 33 | 34 | 13 |
| # of Units | - | 1 | 1 | 1 | 1 | 1 | 1 |
| Style | Townhouse-Mid | Townhouse-Mid | Townhouse-End | Townhouse-End | Townhouse-Mid | Townhouse-Mid | Townhouse-Mid |
| Lot Size | 0.03 acres | 0.01 acres | 0.01 acres | 0.01 acres | 0.03 acres | 0.02 acres | 0.01 acres |
| View | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Neighborhood | Neighborhood |
| Condition | Good | Good | Good | Good | Good | Good | Good |
| Year Built | 1991 | 1989 | 1989 | 1990 | 1993 | 2006 | 1990 |
| Total Room Count | Rms/Bds/Full/Half 7/3/3/1 | Rms/Bds/Full/Half 7/3/3/0 | Rms/Bds/Full/Half 8/3/3/0 | Rms/Bds/Full/Half 8/3/3/0 | Rms/Bds/Full/Half 6/3/3/0 | Rms/Bds/Full/Half 7/3/3/1 | Rms/Bds/Full/Half 9/4/3/0 |
| Above Grade Sq Ft | 2643 | 2600 | 2600 | 2700 | 2100 | 2500 | 2813 |
| Basement SF | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % Basement Finish | - | - | - | - | - | - | - |
| Garage/Carport | 2 Attached | 1 Attached | 1 Attached | 1 Attached | 1 Attached | 2 Attached | 1 Attached |
| Pool/Spa | No | No | No | No | No | No | No |
| Amenities | - | - | - | - | - | - | - |
| Best Sale/List | | | X | | X | | |
| Adjustment for Differences | - | $1,000 | $1,000 | -$1,000 | $40,000 | $1,000 | -$20,000 |
| Adjusted Price | - | $751,000 | $778,500 | $784,000 | $769,000 | $749,000 | $779,000 |
| SP / GLA Per SF | $291.34 | $288.46 | $299.04 | $290.74 | $347.14 | $299.20 | $284.04 |

## Comparable Comments (See Page 3)

## Marketing Strategy

| 30 Day As Is | $765,000 | 30 Day Repaired | $765,000 |
|---|---|---|---|
| 90 - 120 Days "As Is" | $770,000 | 90 - 120 Days "Repaired" | $770,000 |
| As-Is List Price | $775,000 | Repaired List Price | $775,000 |
| Estimated Repairs | $0 | (See following page for repair details) | |

## Subject & Neighborhood Information

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | Zoning: | SFR | Current Use: | Single Family | HOA Fee: | - |
|  | Zoning Code: | 10 | Projected Use: | Single Family | HOA Amenities: | - |
| Neighborhood Comment | | 39% of the properties in the area are owned, 8% are vacant and 53% - rented. There are 32% of Pre Foreclosures, 41% of bank owned properties and 27% of properties that are under auction in the area. Schools in the area are ranked at 8/10. Supply meets demand, values are stable. Subject area is surrounded by residentials. Estimated % of REO Homes: 1%-10%. | | | |
| Environmental Issues | | No | | | |
| Functional or Economic Obsolescence | | No | | | |
| Positive / Negative Features | | none | | | |
| Sewer | | Public | | | |
| Water | | Public | | | |

## Repairs – Exterior

| Item | Description | Estimated Cost |
|---|---|---|
| 1. Exterior Finish | - | $0 |
| 2. Painting | - | $0 |
| 3. Windows | - | $0 |
| 4. Roof | - | $0 |
| 5. Structural | - | $0 |
| 6. Landscaping | - | $0 |
| 7. Outbuildings | - | $0 |
| 8. Debris Removal | - | $0 |
| 9. Utility | - | $0 |
| 10. Other | - | $0 |

## Repairs – Interior

| Item | Description | Estimated Cost |
|---|---|---|
| 1. Patch / Paint | - | $0 |
| 2. Floor Coverings | - | $0 |
| 3. Interior Odors | - | $0 |
| 4. Appliances | - | $0 |
| 5. Carpentry | - | $0 |
| 6. Fixtures | - | $0 |
| 7. Electrical | - | $0 |
| 8. Plumbing | - | $0 |
| 9. Heating / AC | - | $0 |
| 10. Structural | - | $0 |
| 11. Trash Out | - | $0 |
| 12. Debris Removal | - | $0 |
| 13. Other | - | $0 |
| **Grand Total for Cost of Repairs** | | **$0** |

## Quality Control Review

| Item | Quick Sale | 90 - 120 Day |
|---|---|---|
| Field "As Is" Price | $765,000 | $770,000 |
| "As Is" Price Adjusted by Quality Control | $0 | $0 |
| Field "Repaired" Price | $765,000 | $770,000 |
| "Repaired" Price Adjusted by Quality Control | $0 | $0 |

### Quality Control Comment

Passed QC Review

### Map Comments

This report has passed automated quality control criteria and map qc review.

## Purpose

The purpose of this analysis is to provide a probable sale price of the subject property. This analysis is not to be used in lieu of an appraisal for the purpose of determining whether to approve a mortgage loan. Nothing in this report should be construed as a guarantee of value or condition of the subject property. This analysis is not an appraisal and has not been performed in accordance with the Uniform Standards of Professional Appraisal Practices. This report is for the internal use of the name client listed above, and is to assist with mortgage due diligence and internal decision-making processes. It will not be used for loan origination.

## Addendum

1. **Subject Comments** - Subject property is a townhouse, built in 1991 with a 2643sf of gla. Subject is located in a single family neighborhood. Subject conforms to neighborhood. There are no adverse site conditions or external factors such as easements, encroachments, environmental conditions or land uses. Proximity and convenience to employment, schools, parks, shopping and transportation is average. Zoning: SFR.
Property Type: Vendor agrees with the provided property characteristics.
# of Units: Vendor agrees with the provided property characteristics.
Lot Size (Ac.): Vendor agrees with the provided property characteristics.
Year Built: Vendor agrees with the provided property characteristics.
Room Count: Vendor agrees with the provided property characteristics.
Bed Count: Vendor agrees with the provided property characteristics.
Bath Count: Vendor agrees with the provided property characteristics.
Living Sq.Ft.: Vendor agrees with the provided property characteristics.
Basement (Y/N): Vendor agrees with the provided property characteristics.
2. **Sale 1 Comments** - Similar: Provides good similarities to the subject. --------------------
3. **Sale 2 Comments** - Similar: Provides good similarities to the subject. --------------------
4. **Sale 3 Comments** - Similar: Provides good similarities to the subject. ----------------------
5. **Listing 1 Comments** - Inferior: Provides good similarities to the subject, except it has less gla.
6. **Listing 2 Comments** - Similar: Superior due to age, but has less gla. Other features are similar.
7. **Listing 3 Comments** - Similar: Superior due to age, but has more gla. Other features are similar.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: This report is subject to following assumptions and limiting conditions:
1. Assumes that the title is good and marketable and will not render any opinions about the title.
2. Assumes both tax and MLS data is current and accurate.
3. The preparer is not a surveyor, he or she makes no guarantees, express or implied, regarding accuracy of the properties boundaries, nor any special designations, such as Special Flood Hazard Areas.
4. For exterior inspections, the agent has investigated all resources available such as MLS, public records, online data, prior inspections,and information provided by the client to identify the physical characteristics, which includes the interior condition, of the subject property. If reliable information is discovered about the interior condition that is or is not consistent with the exterior condition, then the agent has incorporated that information into their report. Otherwise, the agent has made an assumption that the interior condition of the property is consistent with the exterior condition.
5. The report notes any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she become aware of during the research involved in performing this report. Unless otherwise stated in this report, there is no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, need repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The preparer will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the preparer is not an expert in the field of environmental hazards, this report must not be considered as an environmental assessment of the property.
6. The as "Repaired" conclusion is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

This document was created by an independent agent for RRReview. The following methodology was used with consideration for RRReview policies and any specific client requirements.
**Data Collection:** Public and/or private data was collected and analyzed, including but not limited to all available tax documentation and MLS data, to determine neighborhood characteristics, local market conditions, use, zoning, tax assessments, physical characteristics, transaction history and past or current listing information. Information was then gathered on six other properties that are comparable to the subject property in location, use and dominant features: three that have been recently sold and three that are currently listed for sale.
**Site Inspection:** Per the client instructions, the subject property and surrounding neighborhood were inspected and photographed. This inspection may have been of the interior and/or exterior based on the inspection type. The inspection included a review for the condition of the dwelling, improvements, and any other positive or negative features. Any known environmental issues or functional or economic obsolescence are also taken into consideration.
**Reconciliation:** The collected data was then compiled with information collected from the site inspection and compared to the information from the selected comparables. The properties were compared to the subject using the sales comparison approach, which is primarily based upon the principle of substitution. The property condition, market conditions and any other noted positive or negative influences were also considered. The analysis resulted as a single figure or a range of values, as ordered by the client.
**Reporting:** The summary of the results and the data collection, site inspection and reconciliation were provided on the appropriate report form as ordered by the client.

Please note: Certain state and federal laws may prohibit and/or restrict a real estate licensee who estimates the price/value of real property or may restrict the types of transactions for which the real estate licensee's report can be used. You may wish to confirm with your legal advisor to ensure that this report is used for an appropriate purpose, as set forth in applicable state and federal law.
Certifications:
The agent and/or broker has certified that they are covered by errors and omissions insurance, to the extent required by state law, for all liability associated with the preparation of this report.
The agent and/or broker who executed this report has no existing or contemplated interest in the subject property.

**Subject Property Front View - 2609 N Greenview Ave Apt C , 60614**



12.11.2017

**Subject Property Left Side View**



12.11.2017

**Subject Property Right Side View**



12.11.2017

**Subject Address Verification**



12.11.2017

**Subject Street Scene**



12.11.2017

**Subject Street Scene**



12.11.2017

**Subject Street Scene**

12.11.2017

**Subject Street Scene**

12.11.2017

**Subject Garage**

12.11.2017

**Subject Garage**

12.11.2017

**Subject Miscellaneous**

12.11.2017

**Subject Miscellaneous**

12.11.2017

**Subject Miscellaneous**



12.11.2017

**Subject Miscellaneous**



12.11.2017

**Subject Miscellaneous**



12.11.2017

**Subject Miscellaneous**



12.11.2017

**Subject Miscellaneous**



12.11.2017

**Subject Miscellaneous**



12.11.2017



Subject Miscellaneous
12.11.2017



Subject Miscellaneous
12.11.2017



Subject Miscellaneous
12.11.2017



Subject Miscellaneous
12.11.2017



Subject Kitchen
12.11.2017



Subject Kitchen
12.11.2017

**Subject Dining**



12.11.2017

**Subject Living Room**



12.11.2017

**Subject Living Room**



12.11.2017

**Subject Bath**



12.11.2017

**Subject Bath**



12.11.2017

**Subject Bath**



12.11.2017

**Subject Bath**

12.11.2017

**Subject Bath**

12.11.2017

**Subject Bath**

12.11.2017

**Subject Bedroom**

12.11.2017

**Subject Bedroom**

12.11.2017

**Subject Bedroom**

12.11.2017



Subject Bedroom
12.11.2017



Subject Bedroom
12.11.2017



Subject Bedroom
12.11.2017



Subject Bedroom
12.11.2017



Subject Bedroom
12.11.2017



Subject Bedroom
12.11.2017

**Subject Laundry**



12.11.2017

**Subject Mechanicals**



12.11.2017

**Sale 1 Photo - 2709 N Janssen Ave, 60614**  $750,000



**Sale 2 Photo - 2732 N Southport Ave Unit B, 60614**  $777,500



**Sale 3 Photo - 2733 N Greenview Ave Unit B, 60614**  $785,000



**Listing 1 Photo - 2671 N Greenview Ave Unit B, 60614**  $729,000





Listing 2 Photo - 2638 N Hartland Ct Unit B, 60614    $748,000



Listing 3 Photo - 2730 N Janssen Ave Unit B, 60614    $799,000

**Comparable Data Map**



| Legend | Property | Distance | Street |
|---|---|---|---|
| X | Subject | 0 Miles | 2609 N Greenview Ave Apt C , 60614 |
| 1 | Sale 1 | 0.14 Miles | 2709 N Janssen Ave, 60614 |
| 2 | Sale 2 | 0.18 Miles | 2732 N Southport Ave Unit B, 60614 |
| 3 | Sale 3 | 0.14 Miles | 2733 N Greenview Ave Unit B, 60614 |
| 4 | Listing 1 | 0.08 Miles | 2671 N Greenview Ave Unit B, 60614 |
| 5 | Listing 2 | 0.35 Miles | 2638 N Hartland Ct Unit B, 60614 |
| 6 | Listing 3 | 0.16 Miles | 2730 N Janssen Ave Unit B, 60614 |

**Agent Information**

| | |
|---|---|
| Prepared By Agent: Jurate Biskis | Agent Phone: (630) 802-6655 |
| Agent Email:  edjuservices@gmail.com | License Number: 475.167097 |
| Broker: Jurate Biskis | Expiration Date: 4/30/2018 |
| Distance to Subject: 8.14 miles | Years Experience: 2 |
| Electronically Signed: 12/12/2017 2:02:00 AM | |

**Legal Disclaimer**

This is a broker price opinion/comparative market analysis, not an appraisal of the market value of the real estate, and was prepared by a licensed real estate broker or managing broker, not by a State certified real estate appraiser.

© 2010 Residential RealEstate Review, Inc., all rights reserved.

# Exhibit 24



 **SPS** SELECT
*Portfolio*
SERVICING, inc.



ROBERT D. LOVENTHAL LAW OFFICES
15 HAMMERSMITH ROAD, UNIT 13
NEWPORT, RI 02840-0000

0014258900034011500



December 29, 2017

Robert D. Loventhal Law Offices
Robert D. Loventhal
15 Hammersmith Road, Unit 13
Newport, RI 02840

**Customer Name:**    Robert D. Loventhal
**Account Number:**   0016019226
**Property Address:**   2609 N. Greenview Ave., Unit C
                      Chicago, IL 60614

Dear Mr. Loventhal,

Select Portfolio Servicing, Inc. (SPS), the mortgage servicer on the above referenced account, received your inquiry on December 1, 2017. In your inquiry, you raised questions regarding:

- Modification Request
- Compensation

We have completed a full review of your inquiry and the account, and our response is below.

**Modification Request**

In your inquiry, you expressed frustration regarding the loss mitigation review process. We understand the concern with any delays experienced and recognize the urgency of the request.

Before we can begin our evaluation process, a complete application is required. We require the following information before we can review the account for the available options for which the account may be eligible:

- **Clarification on Homeowner's Association (HOA)-**We received the Request for Mortgage Assistance form with the HOA fee listed as $650.00. However, we spoke with you on May 11, 2017. You advised the HOA fees were $210.00 per month. Please clarify if the amount of $650.00 is for the current primary residence or another property.

If there are any questions about the review process, please contact SPS at the number below. If the property is no longer affordable, SPS offers alternative options such as a Short sale or voluntary surrender of the property. Upon completion of one of these programs, SPS may be able to offer relocation assistance. If you wish to be reviewed for these options, please contact our Loss Mitigation Department.

**Compensation**

You have requested that SPS compensate you for issues relating to the account. Our research shows that we have serviced the account in accordance with the terms of the Adjustable Rate Note and Mortgage documents (enclosed). Therefore, we respectfully decline your request for compensation.

You raised claims regarding unfair and deceptive treatment and deliberately trying to avoid giving a loan modification. We have reviewed your claims and we find no merit to your allegations. SPS is confident that the servicing of the loan by SPS has been compliant with all applicable state and federal regulations.



00142589000034021500

AD999



December 28, 2017

 ROBERT D LOVENTHAL
15 HAMMER SMITH RD UNIT 13
NEWPORT, RI 02840

Customer Name(s): ROBERT D LOVENTHAL
Account Number: 0016019226
Property Address: 2609 N GREENVIEW AVE UNIT C
CHICAGO, IL 60614

Dear Customer(s):

Select Portfolio Servicing, Inc. (SPS), the mortgage servicer on the above referenced account, has completed its review of this account for the loss mitigation assistance requested. SPS conducts its reviews in accordance with applicable laws and investor eligibility rules. SPS is committed to a policy of nondiscrimination in all aspects of its servicing program.

## Loss Mitigation Program Decision

After careful review of your account, we find that there are no home retention loss mitigation options for which you are approved. Review parameters and details are provided below.

## Non-Home Retention Options

You are eligible for the following non-home retention options.

**Short Sale.** If you are interested in selling your property, but owe more than your home is worth, a short sale may be an option. In a short sale, SPS allows you to sell your home and pay off a portion of the principal balance when you owe more money on your mortgage loan than the home is worth. This allows you to move out of your home and avoid going through foreclosure. In some cases, relocation assistance may be available. If you already have a current purchase offer on your home, please contact us immediately and if you haven't already started the process, please follow these steps:

- Choose a real estate agent. Start your search as soon as possible. Look for an agent who has experience working with mortgage companies on home sales. If you need assistance in finding an experienced real estate agent to assist you, SPS can refer you to an agent in your area.
- List your home at fair market value. Make sure you and your agent list your home at a price that is comparable to similar homes for sale in your neighborhood – even if the price is less than what you owe on your mortgage.

CF009        0014253500082010700      0016019226



- <u>Send us your listing agreement and the enclosed forms.</u> Your listing agreement must be signed by all borrowers and received no later than January 11, 2018. Complete and return the enclosed Authorization Form and Acceptance Form. The Acceptance Form allows SPS to suspend legal action while you market and sell the property. The Authorization Form gives us permission to provide and collect information about your mortgage with necessary parties, such as attorneys, bank representatives, lien holders, etc.

Please note that approval of a short sale is conditioned upon receipt of required documentation, investor and/or mortgage insurer approval, if required, and evaluation of the amount being presented for pay off of the outstanding lien.

**Deed in Lieu of Foreclosure.** With a deed in lieu, you agree to transfer the title or ownership of your property to the owner or servicer of your mortgage in order to avoid foreclosure sale and satisfy all or a portion of the mortgage debt. The amount of debt satisfied by this transfer of ownership is based on the approved value of your home. In some cases, relocation assistance may be available.
- Approval for this option is conditioned upon receipt of required documentation, investor and/or mortgage insurer approval, if required, and the ability to provide title to the property clear of all other liens. Please contact us if you are interested in pursuing this option.

As stated, these options have different requirements and guidelines, and not all accounts will qualify. Moreover, some of these options may offer financial assistance for your relocation. Please contact SPS for more detail.

## Regulatory Notice of Non-Approval

SPS reviewed your complete Assistance Review Application for eligibility under its loss mitigation options, which are established through investor rules and are based on your individual circumstances. All program(s) below are the program(s) for which you were denied and the specific reason for non-approval. These denials are based on the criteria where your account did not pass the program eligibility requirements; we did not consider other criteria regarding ineligibility as part of our decision.

- **Home Affordable Unemployment Program (HAUP)**

  **Ineligible Property.**
  We are unable to offer you this program because you do not live in the property as your primary residence.

- **SPS Unemployment Program**

  **Property not Primary Residence.**
  We are unable to offer you this program because you do not live in the property as your primary residence.

- **HAMP Tier 1 Trial Modification**

  **Ineligible Property.**
  We are unable to offer you this program because you do not live in the property as your primary residence.

- **HAMP Tier 2 Trial Modification**

  **Program Expired**
  You are ineligible for this program as it has expired.

- **Proprietary Trial Modification**

  **Excessive Forbearance.**
  We are unable to offer you this program because we are unable to create an affordable payment without changing the terms of your account beyond the program requirements.

0016019226

- **Repayment Plan**

  **Inadequate Funds.**
  We are unable to offer you this program because after reviewing the financial information you provided to us, we have determined that one or more of the following reasons apply:
  - You do not have sufficient net income to pay the proposed payment.
  - The proposed payment is not feasible.
  - Your initial payment on the Payment Plan is not sufficient.
  - The written financial information we received from you does not support the proposed payment.

## Right to Appeal

You have the right to appeal any non-approval by providing a written explanation of why you believe our determination was incorrect, along with all supporting evidence, within thirty (30) days of the date of this letter to:

Select Portfolio Servicing, Inc.
PO Box 65277 Salt Lake City, UT 84165-0277
Relationship.Manager@SPServicing.com

You have thirty (30) calendar days from the date of this notice to contact SPS to discuss the reason for non-approval. **No foreclosure sale will be conducted and you will not lose your home** during this 30-day period or any longer period required for us to review supplemental material you may provide in response to this notice. If a foreclosure sale has already been scheduled we will instruct our attorney to file a motion to postpone such sale. It is possible however that a court will deny the motion and the sale will proceed. If that happens we will be unable to provide loss mitigation.

## Notice of Error or Information Request

If you believe there has been an error with the account or you require additional information, you may send a written Notice of Error or Information Request. All Notices of Error or Information Requests must be sent in writing to the address listed below, as this is our exclusive address under Federal Law for these matters. If you send your correspondence to any other address, it may not be processed in accordance with Federal law.

Select Portfolio Servicing, Inc.
PO Box 65277 Salt Lake City, UT 84165-0277

## Contact Us

If you have any questions, your assigned Relationship Manager, Matt Enright, can be reached toll free at 888-818-6032 Ext. 36357 or by email at Relationship.Manager@SPServicing.com.

At SPS, any of our trained servicing representatives can assist you with answers to your questions about the status or history of your account, document requirements, or any of our available resolution options. If you have any questions or concerns, please contact our Loan Resolution Department. Our toll-free number is 888-818-6032, and representatives are available Monday through Thursday between the hours of 8 a.m. and 11 p.m., Friday from 8 a.m. to 9 p.m., and Saturday from 8 a.m. to 2 p.m., Eastern Time.



CF009      00142535000082020700      0016019226

If you would like to speak with a HUD approved counselor, call the Homeowner's HOPE™ Hotline 888-995-HOPE (4673). The Homeowner's HOPE™ Hotline offers free HUD-certified counseling services and is available 24/7 in English and Spanish. Other languages are available by appointment.

Sincerely,

Select Portfolio Servicing, Inc.

**Esta carta contiene información importante concerniente a sus derechos. Por favor, traduzca esta carta. Nuestros representantes bilingües están a su disposición para contestar cualquier pregunta. Llamenos al número 800-831-0118 y seleccione/marque la opción 2.**

**This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for that purpose.**

**Minnesota - This collection agency is licensed by the Minnesota Department of Commerce
New York City - Collection Agency License # 1170514**

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is the Bureau of Consumer Financial Protection, 1700 G Street NW., Washington, DC 20552.

We will continue to report to credit reporting agencies the status of your mortgage as well as your entry into a Trial Period Plan, in accordance with the requirements of the Fair Credit Reporting Act and the Consumer Data Industry Association. In addition, your mortgage will be reported as paying under a partial or modified payment plan during the trial period. **Credit reporting agencies generally consider entering into a plan with reduced payments as an increased credit risk. As a result, entering into a Trial Period Plan may adversely affect your credit score, particularly if you are current on your mortgage or otherwise have a good credit score.** Visit ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm for more information about your credit.

0016019226

**Net Present Value (NPV) Results**
Below are the inputs used in the NPV calculation conducted during our review for the Trial Modification loss mitigation option.

### NPV Data Input Field Values JPM, BAC (non NMS, non HAMP)

| Input Data Fields | Explanation | Value used in NPV calculation to determine the eligibility of your mortgage |
|---|---|---|
| **I. Customer Information** | | |
| 1. Current Customer Credit Score | This field identifies your credit score as provided by one or more of the three national credit reporting agencies. | 494 |
| 2. Current Co-customer Credit Score | If a co-customer is listed on the mortgage, this field identifies the co-customer's credit score as provided by one or more of the three national credit reporting agencies. | |
| 3. Customer Prior Month Credit Score | This field identifies your credit score for the prior month as provided by one or more of the three national credit reporting agencies. | 480 |
| 4. Co-Customer Prior Month Credit Score | If a co-customer is listed on the mortgage, this field identifies the co-customer's credit score for the prior month as provided by one or more of the three national credit reporting agencies. | |
| 5. Customer Credit Score 12 Months Prior to Decision | This field identifies your credit score as provided by one or more of the three credit reporting agencies in the last 12 months. | 477 |
| 6. Co-Customer Credit Score 12 Months Prior to Decision | If a co-customer is listed on the mortgage, this field identifies the co-customer's credit score as provided by one or more of the three credit reporting agencies in the last 12 months. | |
| 7. Customer Updated Bank Card Usage | This field identifies your use of bank card(s) as provided by one or more of the three credit reporting agencies, updated in the last six months. | 1044 |
| 8. Co-Customer Updated Bank Card Usage | If a co-customer is listed on the mortgage, this field identifies the co-customer's use of bank card(s) as provided by one or more of the three credit reporting agencies, updated in the last 6 months. | |
| 9. Monthly Gross Income | This field identifies the monthly gross income of all customers on your account before any payroll deductions or taxes. | $19,548.86 |
| **II. Property Information** | | |
| 10. Property – State | This field identifies the two letter state code of the property securing your mortgage. | IL |
| 11. Property – Zip Code | This field identifies the zip code of the property securing your mortgage. | 60614 |
| 12. Property Value | This field identifies the estimated fair market value of your property used by us, your servicer for this analysis. | $770,000.00 |
| 13. Property Valuation Type | This field identifies the method by which your property was valued (as noted in Field 6, Property Value). 1. Automated Valuation Model (AVM) 2. Exterior Broker Price Opinion (BPO) /Appraisal (as is value) 3. Interior BPO /Appraisal (as is value) | WALK |



### III. Mortgage Information

| | | |
|---|---|---|
| **14. Data Collection Date** | This field identifies the date on which the Unpaid Principal Balance and other data used in the NPV analysis was collected by us, your servicer. | 12/27/2017 |
| **15. Imminent Default Flag** | This field indicates your default status at the time you asked to be evaluated for a modification. If you have not missed any payments or less than two payments are due and unpaid by the end of the month in which they are due, you are considered to be in imminent default and the value in this field is "Y". If two or more payments are due and unpaid by the end of the month in which they are due at the time of application, the value in this field is "N". | N |
| **16. Investor Code** | This field identifies the owner of your mortgage.<br>1 – Fannie Mae<br>2 – Freddie Mac<br>3 – Owned by a private investor other than us, your servicer<br>4 – Owned by us, your servicer or an affiliated company<br>5 – Ginnie Mae | 3 |

CF009

0016019226

| Input Data Fields | Explanation | Value used in NPV calculation to determine the eligibility of your mortgage |
|---|---|---|
| 17. Unpaid Principal Balance at Origination | This field identifies the amount of your mortgage at the time it was originated (i.e., the amount you borrowed). | $712,500.00 |
| 18. First Payment Date at Origination | This field identifies the date the first payment on your mortgage was due after it was originated. | 09/01/2005 |
| 19. Product Before Modification | This field uses codes to identify the type of mortgage you held prior to applying for a modification:<br><br>1. Adjustable Rate Mortgage (ARM) and/or Interest Only mortgage<br>2. Fixed Rate<br>3. Step Rate<br>4. One Step Variable<br>5. Two Step Variable<br>6. Three Step Variable<br>7. Four Step Variable<br>8. Five Step Variable<br>9. Six Step Variable<br>10. Seven Step Variable<br>11. Eight Step Variable<br>12. Nine Step Variable<br>13. Ten Step Variable<br>14. Eleven Step Variable<br>15. Twelve Step Variable<br>16. Thirteen Step Variable<br>17. Fourteen Step Variable | 1 |
| 20. Adjustable Rate Mortgage (ARM) Reset Date | This field applies only to Adjustable Rate Mortgages (ARMs). If you do not have an ARM this field will be blank.<br><br>This field identifies the date on which the next Adjustable Rate Mortgage (ARM) reset was due to occur, as of the Data Collection Date (Field 8) | 10/01/2020 |
| 21. Next Adjustable Rate Mortgage (ARM) Reset Rate | This field identifies the rate at which your mortgage was expected to change based on when the next reset date (Field 14) is scheduled to occur. Please look to your mortgage documentation for information on how your mortgage's rate is recalculated at its reset date.<br><br>If the reset date on your ARM is within 120 days of the Data Collection Date, this value in this field is the expected interest rate on your mortgage at the next reset date.<br><br>If the reset date on your ARM is more than 120 days from the Data Collection Date, the value in this field is your current interest rate at the time of NPV evaluation. | 2.00000% |

00142535000082040700

0018019226



| Input Data Fields | Explanation | Value used in NPV calculation to determine the eligibility of your mortgage |
|---|---|---|
| 22. Unpaid Principal Balance Before Modification | This field identifies the unpaid amount of principal (money you borrowed) on your mortgage as of the Data Collection Date. It does not include any unpaid interest or other amounts that you may owe. | $699,577.17 |
| 23. Interest Rate Before Modification | This field identifies the interest rate on your mortgage as of the Data Collection Date. | 2.00000% |
| 24. Remaining Term (# of Payment Months Remaining) | This field identifies the remaining number of months you have left to pay under the original term of your mortgage as of the Data Collection Date. | 212 |
| 25. Principal and Interest Payment Before Modification | This field is the amount of principal and interest you were scheduled to pay each month as of the Data Collection Date.<br><br>A. If your mortgage had an adjustable rate scheduled to reset within 120 days, this field will reflect the principal and interest payment associated with the new interest rate.<br><br>B. If your mortgage is an Interest Only mortgage and your account was in the interest only period, the value in this field is the interest payment that was due each month.<br><br>C. If your mortgage is a negative-amortization mortgage, the value in this field is the greater of:<br><br>    a. the principal and interest payment you sent on the most recent payment date; or<br><br>    b. the minimum payment required on your mortgage. | $1,715.04 |
| 26. Monthly Real Estate Taxes | This field identifies the monthly cost of your real estate taxes. If your taxes are paid annually this amount will be 1/12th of the annual cost. | $1,545.41 |
| 27. Monthly Hazard and Flood Insurance | This field identifies the monthly cost of your hazard and flood insurance coverage. If your insurance is paid annually this amount will be 1/12th of the annual cost. | $107.58 |
| 28. Homeowners Association Dues / Fees | This field identifies your monthly homeowner's or condominium association fee payments, if any, and/or any future monthly escrow shortages. If your homeowner's or condominium association fee payments are paid annually, this will be 1/12th of the annual cost.<br><br>If your property has no association fee payments, this field is blank. | $215.00 |
| 29. Months Past Due | This field identifies the number of mortgage payments you would have had to make in order to make your mortgage current, as of the Data Collection Date. | 17 |
| 30. Mortgage Insurance Coverage Percent | This field identifies the percentage of private mortgage insurance coverage on your mortgage. If you do not have private mortgage insurance this field is blank. | |
| 31. Modification In The Last 36 Months | This field indicates if the loan has been modified in the last 36 months. | Y |

CF009

0016019226

| Input Data Fields | Explanation | Value used in NPV calculation to determine the eligibility of your mortgage |
|---|---|---|
| **IV. Proposed Modification Information** | | |
| 32. NPV Date | This field identifies the date that the Net Present Value evaluation was conducted on your mortgage. | 12/27/2017 |
| 33. Unpaid Principal Balance of the Proposed Modification (Net of Forbearance & Principal Reduction) | This field identifies the beginning principal balance on which you would have been required to pay interest if you had received a modification. It is likely to be different than your current principal balance because it includes amounts you owe for missed mortgage payments and unpaid expenses that are allowed to be added (capitalized) to your principal balance. Additionally, it may be reduced by proposed principal forbearance (Field 30) or proposed principal forgiveness (Field 31). | $0.00 |
| 34. Interest Rate of the Proposed Modification | This field identifies the starting interest rate of the proposed modified mortgage. This rate is fixed for at least the first 5 years after modification. | 0% |
| 35. Amortization Term of the Proposed Modification | This field identifies the number of months left to pay the proposed modified mortgage. | 0 |
| 36. Principal and Interest Payment of the Proposed Modification | This field identifies the amount of the monthly principal and interest payment on the proposed modified mortgage. | $0.00 |
| 37. Principal Forbearance Amount of the Proposed Modification | This field identifies the amount of forbearance; the amount of principal your investor was willing to forbear on the proposed modified mortgage. You would have still owed this amount, but you would not be charged interest on it and no payments would have been due on this amount until you paid off your mortgage. | $0.00 |
| 38. Principal Forgiveness Amount of the Proposed Modification | This field identifies the amount of principal your investor was willing to forgive under the proposed modified mortgage. | |
| 39. Modification Fees | This field identifies the total amount of costs and fees that would have been paid by the investor (owner) of your mortgage, if you had been approved for a modification. It includes expenses such as notary fees, property valuation, credit report and other required fees. | $0.00 |
| 40. Mortgage Insurance Partial Claim Amount of the Proposed Modification | This field identifies any mortgage insurance payout amount as part of the proposed modified mortgage, which is, at the discretion of your mortgage insurance company. This should be zero if you were not approved for a trial period plan or permanent modification for reason of negative NPV. | $0.00 |



**SHORT SALE**
**ACCEPTANCE FORM**

Send this signed form with your Property Listing Agreement (signed by all borrowers) and the enclosed
Authorization Form by January 11, 2018 to start the process. You don't need to send a payment at this
time. After we receive the documents above, we will contact you with information about the specific
details of the sale process.

Send this form and the additional required documents to:

General Mail:
Select Portfolio Servicing, Inc.
PO Box 65277 Salt Lake City, UT 84165-0277
Fax: 801-270-7833
Email: shortsale@spservicing.com

SPS Account Number: 0016019226

Sign: _____ Date: _____

ROBERT D LOVENTHAL

Sign: _____ Date: _____



**SPS** SELECT
Portfolio
SERVICING, Inc.

## General Third Party Authorization

Please send this completed authorization to:

SPS Account Number: _____

SPS Customer(s) Name: _____

Property Address: _____

Select Portfolio Servicing, Inc.
PO Box 65250
Salt Lake City, UT 84165
or
Fax: 801-269-4405

I (we) hereby authorize Select Portfolio Servicing, Inc. (SPS) to release, furnish, and provide any information related to the above-referenced mortgage account to:

Third Party Name: _____

Company Name: _____

Relationship to Customer(s): _____

Phone Number: _____ Fax Number: _____

If the above authorization is a result of a Power of Attorney, Order of Guardianship/Conservatorship, or Administration of an Estate, please attach documentation verifying this authority.

If your authorization is for something <u>other than a full account disclosure</u>, please indicate below which <u>limited information</u> you authorize SPS to release, furnish and provide to the above authorized third party.

☐ Verification of Mortgage

☐ Payment History

☐ Other _____

☐ Payoff Statement as of Date _____

Please indicate the payoff reason:

☐ Refinance with other company

☐ Sale of property

I hereby authorize the above-referenced individual(s) to obtain information regarding my mortgage account identified above. I agree that SPS will not be held responsible in any manner for relying upon or following the authorization and/or instructions I have given herein. I also agree that SPS has no responsibility to verify the identity of my authorized third party, nor will SPS be liable for anything my authorized third party may do with the information they obtain regarding my account. I acknowledge and agree that fees, as allowed by law and my mortgage documents, may be assessed to my account as a result of my authorized third party's request(s).

This authorization is valid for one (1) year from the date of receipt unless otherwise specified here: _____ If at any time I choose to revoke this authorization, it is my responsibility to notify SPS by calling SPS's Customer Service Department at 800-258-8602.

_____        _____
Customer Signature                 Date

_____        _____
Co-Customer Signature              Date

Please allow up to three (3) business days after receipt for this authorization to be uploaded into your account.



CF009                    00142535000082070700                    0016019226